STATE OF COLORADO }
Arapahoe County. } ss.
CERTIFIED to be a full, true and cor-
rect copy of the original in my custody.

DATED: December 5th AD 2012

DEC 0 5 2012

| | |
|---|---|
| **DISTRICT COURT, ARAPAHOE COUNTY, COLORADO**<br>7325 South Potomac Street<br>Centennial, Colorado 80112<br><br><br><br>**Appellants:** William Bartnick, Laura Bartnick<br><br>**v.**<br><br>**Appellee:** City of Englewood | *EFILED Document of the District Court*<br>*CO Arapahoe County District Court 18th JD*<br>*Filing Date: Nov 30 2011 12:55PM MDT*<br>*Filing ID: 3x450392*<br>Review Clerk: N/A<br><br>**♦ COURT USE ONLY ♦**<br><br>Case Number: 2009CV1942<br><br>Div.: 408 |
| **ORDER ON APPEAL** | |

THIS MATTER comes before the Court on Appellants' Opening Brief and Appellee's Answer Brief. The Court has reviewed the briefs, the record on appeal, and relevant law, and now AFFIRMS in part and OVERTURNS in part.

## BACKGROUND

William and Laura Bartnick ("Bartnicks") have been residents of Englewood, a Home Rule Municipality, ("the City") since 2007. The Bartnick home located at 3029 S. Pearl, Englewood, Colorado was zoned R-1-C pursuant to the Englewood Zoning Ordinances. The Bartnicks wished to open their house for boarding purposes. In February of 2007, the Bartnicks hired Welch Construction to act as a general contractor for the renovation. There was initial work on the house by a plumbing, electrical, and general construction contractor and permits were pulled for these purposes. In August of 2007, the City completed "rough-in" inspection of the work and had no issues. On August 13, 2007, Welch Construction informed the City of its "departure as General Contractor from 3029 So. Pearl Street, permit #2007-00052." See Plaintiff's Exhibit 2. The Contractor stated, "[t]he owner Laura Bartnick and I have agreed to remove my company, Welch Construction LLC from any responsibility for construction performed at this address after August 1, 2007. My responsibility covers a period of time to which all construction up to the time the drywall was installed, inspected, approved and nothing beyond that phase of constructions." Exhibit 2. Castle Plumbing also informed the City that they had not performed any work since the rough plumbing in July of 2007 and had not performed any final plumbing work.[1]

In October, the Bartnicks applied for "home-owner" permits to complete the construction. This form of permit contemplates that the homeowner will complete the construction on their own and that no compensation will be paid to any contractor for the work. However, the work was not being completed by the Bartnicks. They were using unlicensed contractors to complete the work and were paying them between $10.00 and $15.00 per hour or compensating them with steak dinners. Ms. Bartnick stated on an application for a mechanical

---

[1] Castle Plumbing sent a note to the City on January 2, 2008 explaining these facts.

2 aa
Final Order

and plumbing permit that "my husband's friend helped us" and that the price of the work was "two steak dinners" and "1 lunch + 1 dinner." Ms. Bartnick also admitted in her "My Space" page on October 9, 2007, that "[t]wo of our previous renters, whom we love all the more now, have been coming over to our house to work for fractions of the cost to get things back together. $10 and $20 per hour/ A best friend of my husband's who happened to be a plumber put in all our bathroom fixtures for $15 per hour. And a good friend who happens to be deaf, who is very talented in many parts of the trade came back to work for us doing the tile in all the bathrooms (floors and counters) and the fireplace mantel. Tomorrow we shell it out for the boiler heat to be revamped." See Exhibit 12.

By the date of this MySpace post, the work was substantially done. The Bartnicks had added a second floor and had divided that space into four additional "self-contained" living spaces. Ms. Bartnick also admits that as of this post "with Jeremy coming in next month the house would be full. The South Korean student came first." Thus, by October 9, 2007 the home was being used as a boarding house.

One of the Bartnicks' neighbors, Ronald Noffsinger, objected to this use. He notified the city and complained of the Bartnicks' use of the home as a boarding house. He told the Bartnicks that he was going to complain to the city and threatened to "shut them down." The City investigated. Originally, the Bartnicks had hired a contractor who had obtained permits for construction. On January 10, 2008, after determining that the contractor was no longer working on the project, the City invalidated the permits retroactively. The "home-owner" permits were denied on the same day. No notice was given to the Bartnicks of the revocation of the contractor permits nor were they given an opportunity for a hearing or appeal of the invalidation. [2]

The City brought zoning violation charges against the Bartnicks which were eventually filed in Englewood Municipal Court. These cases are denominated as Case No. 5760M, B291, and B292. Case No. 5760M was dismissed by the City. The cases concerned a number of alleged violations of the Englewood Municipal Code ("the Code or EMC"). The Bartnicks admittedly were operating a boarding house allegedly in violation of city ordinances, had made improvements upon their residence without valid building permits, and had allegedly violated a number of requirements to license a business with the City. On December 9, 2008, both Mr. and Mrs. Bartnick received a summons informing them that they had been charged with violations of several provisions of the Code. These violations included violation of sections 16-1-5(E)(1); 16-5-2; 8-1-1; 16-5-4; 16-5-4(C)(1)(e);and 5-1-2. See Summons and Complaint filed December 8, 2008 Record on Appeal ("ROA") I1, I3, J1, J3.

EMC section 16-1-5(E)(1) provides that "[n]o building, structure, or land may hereafter be erected, constructed, moved or altered except in conformity with all regulations of this Title." Section 16-5-2(A)(7) provides in pertinent part:

---

[2] At the zoning violation hearing, the City explained that had the Bartnicks obtained a contractor to take responsibility for the work done at the house after the revocation and denial of their permits, the work could have been approved. However, there was no testimony at the hearing that supported that the Bartnicks were ever advised of this option.

16-5-2 Use Specific Standards
(A) Residential Uses
    (7) Boarding or Rooming House.  Boarding or rooming houses are subject to
    the following standards:
        (a) The use shall apply for and receive a Conditional Use Permit.
        (c) The use shall submit a Zoning Site Plan for review by the City
        (e) The use shall have a City Sales Tax license if required
        (f) The use shall comply with all applicable City Codes.

EMC §16-5-2, ROA L1.

EMC section 8-1-8(E) provides that:

It shall be unlawful for any person to do or cause to be done, or perform, or cause to be performed any act contrary to or in violation of any of the provisions of this Code or any other code, ordinance, rule or regulation promulgated thereunder including the following:

E. *Permits.*  To excavate, erect, construct, enlarge, remodel, alter, repair, move, improve, remove, convert, or demolish any building structure or utility in the City without first obtaining a permit in accordance with the provisions of this Code.

EMC §8-1-8(E).  The maximum punishment for violation of the ordinances was $1,000.00 per violation or 60 days in jail or both.  ROA MM17.

The Bartnicks sought to take the case to arbitration on January 14, 2009.  ROA V1.  The municipal court denied this motion finding that there was no authority for the court to submit the matter to Binding Arbitration.  ROA W1.  The Bartnicks then filed a document entitled "Joint, Verified Defendants' Complaint, Counterclaims and Cross-Claims."  ROA Y1.  This 22 page document attempted to raise a number of issues which the Bartnicks sought the court to review.  These issues included: failure to join an indispensible party; issuing a warrant or subpoena on a citizen's complaint; allegations of religious discrimination; conspiracy; and a number of other issues.  Twenty-one pages of the document contained a recounting of the factual situation leading up to the case, the alleged conspiracy between the Bartnicks' neighbors and employees of the City or the City Council and Mayor, and statements of legal principles which the Bartnicks believed acted as an affirmative defense to the action.  The Bartnicks also filed a Joint Motion to Dismiss Cases with Prejudice or for Summary Judgment.

The Cases were consolidated on January 14, 2009.  On February 11, 2009, the municipal court declined to issue a summons and warrant on the Citizen Complaint and found that the procedures of counterclaims and cross-claims were civil in nature.  The instant complaint being criminal in nature, the municipal court declined to add the counter-claims and cross claims.  ROA CC1-2.  In an additional order, the municipal court denied the Bartnicks' Joint Verified Motion to Dismiss Cases with Prejudice or for Summary Judgment.  ROA DD1.

The Bartnicks demanded a jury and were tried before an Englewood Municipal Court. They appeared with counsel before the municipal court. The Bartnicks filed multiple pretrial motions and the municipal court judge ruled on each motion either prior to trial, or, if they were raised in violation of his pretrial order, at trial. On August 14, 2009, the Bartnicks were each convicted of violating Englewood Municipal Codes §§ 16-5-2(A)(7) and 8-1-8(E). Judgment entered against them on October 9, 2009. The Bartnicks were sentenced to one year probation with mandatory compliance hearings.

Bartnicks appeal their convictions pursuant to section 13-10-116, and Colorado Rule of Criminal Procedure 37 as adopted by Municipal Court Rules of Procedure 237. The Bartnicks appear *pro se*. In their opening brief, the Bartnicks filed numerous allegations of error. Generally, the Bartnicks contend that the pertinent sections of the Code are unconstitutional as applied under the United States Constitution and the Colorado Constitution, and may be in conflict with various existing statutes and ordinances. The Bartnicks also generally contend that the jury verdict should be set aside as there was no factual support for the verdicts. The Bartnicks were ordered to specifically provide a statement of the issues on appeal in their opening brief. Pursuant to agreement of the parties, the Bartnicks seek appeal on the eleven issues contained in their Reply Brief submitted March 11, 2011. These issues will be considered below.

## STANDARD OF REVIEW

The standard of review is whether the verdict is supported by substantial, competent evidence on the record or reasonable inferences therefrom. *People v. Anderson*, 177 Colo. 84, 86, 492 P.2d 844, 845 (Colo. 1972). In reviewing the record, the Court is mindful that "the role of the appellate court is to determine whether the trial court's legal conclusions are supported by sufficient evidence and whether the trial court applied the correct legal standards." *People v. Pate*, 71 P.3d 1005 (Colo. 2003).

## ANALYSIS

### I: Bartnicks' Guilty Verdicts Should Be Vacated

Bartnicks seek to have their criminal convictions reversed or overturned. They have raised multiple grounds as bases for overturning the convictions. Each of these grounds is discussed below:

### A. Improper Service of Notice

Bartnicks assert that since they (or their housemates) did not receive Service of Process or notice before their permits were revoked, they cannot be held accountable for being in violation of Englewood Municipal Code § 8-1-8 (E): Unlawful Acts.

To review this issue, the Court must first review the applicable section. The Bartnicks were charged with violating § 8-1-8: Unlawful Acts. This provision provides "[i]t shall be

unlawful for any person to do or cause to be done, or perform or cause to be performed any act contrary to or in violation of any of the provisions of this Code or any other code, ordinance, rule or regulation promulgated thereunder including the following: (E) *Permits.* To excavate, erect, construct, enlarge, remodel, alter, repair, move, improve, remove, convert or demolish any building, structure or utility in the City without first obtaining a permit in accordance with the provisions of this Code."

Bartnicks requested and were issued permits March 27, 2007 to add a second story to their house on Pearl Street. They originally hired licensed contractors to do the work. The Contractor performed his last work in July of 2007.

Bartnicks sought homeowner permits to complete the work. Bartnicks worked to finish their home with the help of friends and family. Final inspections took place January 3, 2008, and only minor corrections were needed. However, the City, which had received numerous complaints from the neighbors concerning the Bartnick project, determined that the contractors who had been issued the initial permits had ceased work in July 2007. Based on information received from the contractors and from the Bartnicks' neighbors, the City determined that the Bartnicks were completing the project by paying unlicensed contractors. Ms. Bartnick's MySpace page revealed that she compensated some workers at $10.00 - $15.00 dollars an hour. She also admitted on the application for homeowner permit that she paid others by buying them lunch or dinner. On January 7, 2009, the city retroactively voided the contractor permits back to the time when the contractors left, retroactively voided the homeowner permits, and did not issue a Certificate of Occupancy or new building permits.

It is undisputed that Bartnicks were never notified that their permits were in question; nor were they granted a hearing at any point in order to defend themselves or have the permits reinstated. They assert that this is a violation of their Due Process rights.

The issue raised by the Bartnicks is whether or not this failure to notify them prior to revoking their permits violates their constitutional rights under the Due Process Clause. The Fourteenth Amendment to the United States Constitution mandates that a state may not deprive any person of life, liberty, or property without due process of law. U.S. Const. Amend XIV. The definition of the type of property that is safeguarded by the Fourteenth Amendment has evolved to encompass not only tangible physical property, but also a legitimate claim of entitlement to certain circumscribed benefits. *See Board of Regents v. Roth,* 408 U.S. 564 (1972).

Under Colorado law, the right to use property is fully protected by the Due Process Clauses of the federal and state constitutions, but is subject to a proper exercise of the police power. *Western Income Properties, Inc. v. City & County of Denver,* 174 Colo. 533, 485 P.2d 120 (1971); *Sundheim v. Board of County Comm'rs,* 904 P.2d 1337 (Colo.App.1995), *aff'd,* 926 P.2d 545 (Colo.1996). Zoning ordinances are generally upheld as valid exercises of the police power to regulate public health, safety, and welfare. *See City of Colorado Springs v. Securcare Self Storage, Inc.,* 10 P.3d 1244 (Colo.2000).

Colorado courts have recognized vested rights in the context of building permits. The Supreme Court has held that "[a] city permit can provide the foundation for a vested right, and thus be constitutionally protected from impairment by subsequent legislation, if the permit holder

takes steps in reliance upon the permit." *P-W Investments, Inc. v. City of Westminster*, 655 P.2d 1365, 1371 (Colo.1982); *see also Crawford v. McLaughlin*, 172 Colo. 366, 473 P.2d 725 (1970).

Bartnicks received their first set of permits in March 2007. The City retroactively voided Bartnicks' building permits *after* final inspections. The Bartnicks sought additional homeowner permits in the fall of 2007. Work was completed on the project in October of 2007. Based on these permits, the Bartnicks took more than mere steps in reliance. They completed the work authorized by the permits. Because the City never provided Bartnicks with notice that it intended to void the permits or held a hearing regarding the permits, and voided the permits retroactively, the Bartnicks' rights to due process were violated.

For the reasons set above, Bartnicks' convictions of Englewood Municipal Code Section 8-1-8(E) based on failure to obtain valid permits are REVERSED.

### B. Improper Prosecution of a Victimless Crime

Bartnicks assert that "City's Counts 1 through 4, City failed to claim the Bartnicks' private home use ever burdened the City or neighbors and thus there was no victim, as must be established in a criminal case...." *Appellant's Reply Brief*, at 2. The General Assembly has formulated several crimes codified in the statutes of the State of Colorado which are "victimless." *See e.g.*, § 18-18-403.5; 18-18-404; 18-4-512. There is no dispute that Englewood is a home rule city pursuant to Colorado Constitution, Article XX, sect. 6. It is empowered as a home rule city to draft municipal ordinances pursuant to its charter. Englewood's home rule charter is controlling law on matters of local concern. *See Conrad v. Thornton*, 191 Colo. 444, 553 P.2d 822 (1976); *see also Englewood Police Ben. Ass'n, Fraternal Order of Police Lodge No. 22 v. City of Englewood*, 811 P.2d 464, 465 (Colo.App.1990). The Colorado Constitution grants municipalities that satisfy certain size requirements and adopt home rule charters the authority to legislate on issues of local concern. Colo. Const. art. XX, § 6. A home rule municipality's legislation on local matters preempts any conflicting state legislation. *City of Northglenn v. Ibarra*, 62 P.3d 151 (Colo.2003). "[R]egulated matters fall into one of three broad categories: (1) matters of local concern; (2) matters of statewide concern; and (3) matters of mixed state and local concern.... [W]hether state or local legislation controls in a given situation often turns on whether a matter is of local, state or mixed concern." *City of Northglenn v. Ibarra*, *supra*, 62 P.3d at 155 (citing *City of Commerce City v. State*, 40 P.3d 1273, 1279 (Colo.2002)); *See JAM Restaurant, Inc. v. City of Longmont*, 140 P.3d 192, 194 (Colo.App.2006).

As a home rule city, Englewood's zoning policies and authority are governed by its own charter and ordinances. Colo.Const. Art. XX, Sec. 6. *See also City of Colorado Springs v. Smartt*, 620 P.2d 1060, 1062 (Colo.1980). Consequently, the Court looks to the City's charter and ordinances to identify the extent of the zoning and rezoning authority vested in its City Council. The Colorado Constitution grants home rule cities broad authority to draft and implement ordinances that address local matters. *See* Colo.Const. art. XX, § 6. In general, zoning is classified as a local and municipal matter. *City of Colorado Springs v. Securcare Self Storage, Inc.*, 10 P.3d 1244 (Colo.2000); *see Voss v. Lundvall Bros.*, 830 P.2d 1061 (Colo.1992); *City of Greeley v. Ells*, 186 Colo. 352, 527 P.2d 538 (1974); *Roosevelt v. City of Englewood*, 176 Colo. 576, 492 P.2d 65 (1971). Accordingly, home rule cities may draft and implement zoning

ordinances so long as the ordinances comply with any limitations in the state constitution and the city's charter. *City of Colorado Springs v. Securcare Self Storage, Inc., supra; see also JAM Restaurant, Inc.,* 140 P.3d 192, 195 (Colo.App.2006).

Zoning of this type is specifically a matter that is of local and municipal concern. *Roosevelt v. City of Englewood,* 176 Colo. 576, 492 P.2d 65 (1971). The zoning ordinances of the EMC do not specify that there needs to be a victim for this matter. Therefore, based on the record before this Court, allowing these cases to go forward was not an abuse of discretion by the trial court and was substantially supported by evidence in the record.

## C. The Jury Instructions Were Too Vague

Bartnicks assert in this appeal that the term "applicable" in the jury instructions regarding the 16-5-2(A)(7) violations was vague. Instruction 3, Item 7 stated an element of the crime being "without complying with all applicable codes of the City of Englewood." *Municipal Court Record PPP3, line 6-14.* One of the Bartnicks' defenses at trial was that the new ordinance was unlawful, as it had been improperly promulgated. This was the subject of a pretrial motion and the municipal court found the ordinance valid. AAA1. Indeed, at the close of the People's case, the Defense raised the issue again[3]. *See* ROA at 000S200 – 210. The record on appeal reveals that the Bartnicks alleged that the ordinance was invalid because the City had not complied with all procedural requirements contained within the EMC to enact the ordinance. The municipal court specifically found that the Bartnicks' argument had no merit.

Municipal Court Rule 230 provides that "the court shall disclose to the parties the instructions it intends to give to the jury. . . If the court is a court of record, a record shall be made of all objections to the proposed instructions of the court." The Court has reviewed the transcript of proceedings. There is no record of any objection raised with regard to Jury Instruction Number Three. The Bartnicks' failure to object to the jury instruction constitutes a waiver of this objection on appeal. *See People v. Burgess,* 946 P.2d 565, 570 (Colo. App. 1997).

## D. Bartnicks were Denied Discovery

Bartnicks argue that since the lower Court denied their Motion to Compel Discovery, they were denied discovery. The lower court's order, signed May 11, 2009, states that Englewood had complied with the court's previous order regarding discovery. ROA CCC1. The court previously had ordered the City to provide all documents associated with the case to be made available for review and copying by February 19, 2009. *Municipal Court Record MM 9.* The City Attorney and the court conformed to the rules of procedure and the trial court's order regarding discovery. This Court reviews a trial court's resolution of discovery issues for an abuse of discretion. *People v. Denton,* 91 P.3d 388, 391 (Colo. App. 2003); see also *People ex rel. A.D.T.* , 232 P.3d 313, 316 (Colo.App. 2010). The record reveals no abuse of discretion from the trial court.

---

[3] It appears the Bartnicks may have been represented by one counsel pre-trial and another at trial.

### E. Judge Failed to Provide Bartnicks the "Nature of the Case" and "Rules of the Court"

For part of the proceedings, Bartnicks appeared *pro se*. *Pro se* litigants are held to the same standards as licensed attorneys. *Yadon v. Southward*, 64 P.3d 909 (Colo.App.2002). Bartnicks were presumed to know the rules of procedure and the nature of the case. The trial court provided the Bartnicks with the Complaint. The court confirmed that the Municipal Rules would govern. ROA MM10. The Bartnicks were specifically told on the record that they would be held to the same standard as an attorney if they chose to appear *pro se*. ROA MM7. Other than that, the record reveals that the court treated Bartnicks in the same manner it would treat any attorney appearing before it. In addition, the Bartnicks were represented by counsel both pre-trial and during trial. Based on the record before this Court, the Court finds no abuse of discretion from the trial court which would require reversal on this ground.

### F. Judge Denied a Valid Theory of Defense

Bartnicks assert that because the court ordered them not to argue grandfathering as a defense to the crime charged, they were denied a valid theory of defense. The Bartnicks filed a motion pretrial arguing that they should be permitted to pursue a grandfathering theory of the case. *See Joint Verified Motion to Dismiss Cases with Prejudice or for Summary Judgment.* The court held this argument in abeyance until the status/motions hearing. ROA DD1. Initially, the trial court was inclined to disallow the grandfathering argument because the Bartnicks failed to comply with the requirements to have their non-conforming use considered under the grandfathering portion of the ordinance. However, at trial the court reconsidered the issue in part. The Bartnicks' counsel raised the issue pre-trial. ROA OOO13. The trial court took this as an oral motion to clarify its prior ruling or reconsider it. The trial court then stated:

> I've thought about this, you know, and I think the reality may very well be that at some point this, during this trial someone's going to say this issue of grandfathering is going to come up and, and I think that if it does come up, what I would propose is that we just have, uh, some sort of limiting instructions saying that the Court has already determined in this case that the Defendants in this case were not grandfathered under the ordinances and, therefore, that the jury in this case is to determine whether or not they've met the ordinances that they're being charged with and we can tweak the languages. But, if, if it comes up, I think, and it's likely to come up, I think, is the reality that's what I'm going to propose would happen.

ROA 00013 – 15. The City stated that it was concerned that the jury might be confused, given the timelines in this case. The court responded that it had ruled, but that if the City was going to open up the door to testimony with regard to "grandfathering," then the court would permit the Bartnicks to introduce evidence on this part. There was no objection raised by the Defense at this point. ROA 00016. Thus, the issue of prejudice raised by the Bartnicks is raised for the first time on appeal.

2 ∂∂

As a general rule, issues not presented in the trial court are deemed waived and cannot be raised on appeal. *Christensen v. Hoover*, 643 P.2d 525, 531 (Colo.1982); *Matthews v. Tri-County Water Conservancy District*, 200 Colo. 202, 206, 613 P.2d 889, 892 (1980); *McMullin v. Magnuson*, 102 Colo. 230, 244–45, 78 P.2d 964, 971 (1938); *see also Paine, Webber, Jackson & Curtis, Inc. v. Adams* 718 P.2d 508, 513 (Colo.,1986). Thus, as this argument was waived, it cannot form the basis for reversal of the jury's verdicts.

## II: The Judge was Biased Against Bartnicks, and Denied Them a Fair Trial

Bartnicks assert that because the trial judge is an employee of the City, and because there is evidence that he is family friends with the City Manager and a City Councilman, that the judge was inherently biased against Bartnicks. They also assert that the Judge participated in *ex parte* meetings with interested parties during which he received false information on which he later relied, to the detriment of Bartnicks.

The judge assured Bartnicks during the first Motions Hearing that he would be fair and impartial. In fact, he stated that he was purposefully unfamiliar with the details of the case on the chance that it would go to a bench trial, and he didn't want to have any preconceived ideas going into the trial.

Ms. Bartnick inquired at the February Motions hearing whether or not the Judge was employed by the City of Englewood. The judge freely admitted that he worked for the City. However, he carefully explained that he was not appointed by the City Council, but rather was elected by the Citizens. He stated:

> So, this court has independence from the city that is absolutely unique in the state of Colorado and that's something that I value tremendously. I do work for the City of Englewood, I am employed by the City of Englewood, however, I want to say this to be clear from the start, this case will not be treated any differently from any other case before the court. Okay? It will be treated exactly the same and that means that you have the same rights and you have the same obligations.

ROA MM 10-11.

The record contains no clear and convincing evidence that the judge was biased. There is nothing in the record to indicate that *ex parte* meetings occurred. The record reveals no abuse of discretion from the trial court and as a result, the convictions cannot be reversed on this basis. Further, issues not presented in the trial court are deemed waived and cannot be raised on appeal. *Christensen v. Hoover*, 643 P.2d 525, 531 (Colo.1982); *Matthews v. Tri-County Water Conservancy District*, 200 Colo. 202, 206, 613 P.2d 889, 892 (1980); *McMullin v. Magnuson*, 102 Colo. 230, 244–45, 78 P.2d 964, 971 (1938); *see also Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 513 (Colo. 1986). The Bartnicks never filed a Motion for Recusal, or a Motion to Change Venue prior to trial. Thus, as this argument was waived, it cannot form the basis for reversal of the jury's verdicts.

### III: Guilty Verdicts Violated Several of Bartnicks' Constitutional Rights

*A. Takings Clause*

Bartnicks assert that their conviction constitutes a governmental taking, and they have been denied the following personal property without compensation: a) Peaceable Assembly, b) Hope, c) Choice of Housemates, d) Religious Capacity, e) Full Benefit of Their Investment, f) Floor space, and g) Confidence in contracts with the City. Reading the Bartnicks' pleadings liberally, it appears that they assert that the imposition of the City's zoning regulation, and barring them from running a boarding house, constitutes a taking of property without just compensation in violation of Colo. Const. art. II,§15. The Colorado Constitution provides that all persons have certain inalienable rights, which include the right to acquire, possess, and protect property. Colo.Const. art.II,§3. Furthermore, the government cannot take or damage private property without providing just compensation to the owner prior to the divestment or diminution of the owner's proprietary rights. Colo.Const. art.II,§15. Accordingly, a municipality's authority to enact and enforce zoning ordinances is limited by the takings clause in the Colorado Constitution. *JAM Restaurant, Inc.,* 140 P.3d 192, 195.[4]

A presumption of validity attaches to zoning decisions of municipal zoning authorities. Thus, a party challenging a zoning ordinance on constitutional grounds assumes the burden of proving the asserted invalidity beyond a reasonable doubt. *Sellon v. City of Manitou Springs,* 745 P.2d 229 (Colo.1987); *See Trailer Haven MHP, LLC v. City of Aurora,* 81 P.3d 1132, 1137 (Colo.App.2003). A land use regulation constitutes a taking when applied to a particular property if it does not substantially advance legitimate state interests or if it prevents economically viable use of the property. A governmental regulation that prohibits all reasonable use of property constitutes a taking within the meaning of Colo. Const. art. II, § 15. However, a landowner is not constitutionally entitled to use its property in a manner that results in the maximum attainable profit. *Van Sickle v. Boyes,* 797 P.2d 1267 (Colo.1990); *see also Trailer Haven,* 81 P.3d 1132, 1137.

In questions of taking, the Court is concerned with whether the owner is foreclosed from all reasonable use of the property. *Van Sickle v. Boyes, supra.* Here the Bartnicks are not

---

[4] *JAMS Restaurant* involved application of section 38-1-101(3)(a) in the context of a non-conforming use where the zoning ordinance was enacted to stop a prior lawful non-conforming use. Section 38-1-101(3)(a) indicated the General Assembly's concern regarding home rule cities enacting zoning ordinances that eliminate or terminate nonconforming property uses which were lawful at their inception through amortization "without providing just compensation to the property owners." Colo. Sess. Laws 2003, ch. 420, § 1(1)(d) at 2666. The General Assembly enacted § 38-1-101(3)(a) to restrict the abilities of local governments to unjustly deprive property owners of their inalienable rights. Colo. Sess. Laws 2003, ch. 420, § 1 at 2666-67. *See JAM Restaurant,* 140 P.3d 192, 196 (Colo.App. 2006). Here the Bartnicks failed to comply with the requirements to permit them to grandfather their use. Thus, section 38-1-101(3) does not apply.

foreclosed from all reasonable use of the property. They may still use the property as a residential home. Therefore, the Court finds that there has been no taking and declines to reverse the Municipal Court's decision on this basis.

### B. Zoning Ordinance Does Not Meet Strict Scrutiny Standard of Review

Bartnicks assert that Ordinance 55 is not substantially related to a compelling government interest. When an ordinance is both neutral and generally applicable, it need only be rationally related to a legitimate governmental interest to be constitutional. *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006); *see also Axson-Flynn v. Johnson, supra*, 356 F.3d at 1294 ("Neutral rules of general applicability ordinarily do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief") (footnote omitted) ); *see also Town of Foxfield v. Archdiocese of Denver*, 148 P.3d 339, 346 (Colo.App. 2006).

Here the Court finds that Ordinance 55 was enacted to eliminate boarding houses in R-1-C residential zones, in the interest of safety and relieving congestion. It is rationally related to the government interest of maintaining health and safety standards in residential housing. Thus, there is no basis for reversal on this issue.

### C. Right to a Speedy Trial

Bartnicks assert that the deadline for Speedy Trial began to run at the time the City filed the first Complaint (5760M) against Mrs. Bartnick. Citation 5760M was dismissed without prejudice. Speedy trial on that charge ended when it was dismissed. The Speedy Trial statute does not allow for Speedy to continue running after a charge has been dismissed, in the event that new charges relating to the same incident are later brought. Speedy does not begin to run until an arraignment, and each new citation gets its own Speedy Trial calculation. *Rowse v. District Court In and For Alamosa County*, 502 P.2d 422 (Colo. 1972).

The citations under which Bartnicks were convicted were served on December 21, 2008. They were arraigned on January 14, 2009. The City had until April 14 to bring the Bartnicks to trial. A trial date was set for April 8, 2009. Waiver of Speedy Trial was issued by the Defendants on March 10, 2009, resetting Speedy to June 8. Based upon request of the Defendants, the trial was reset to August 14th. The record establishes that a valid waiver of Speedy Trial was issued on May 28, resetting Speedy to August 28. The trial began August 14, 2009. Thus, the record supports a conclusion that the Bartnicks' rights to Speedy Trial were not violated.

### D. Statute Which Bartnicks were Convicted of Violating is Vague

Bartnicks assert that the definition of the term 'household' in the Englewood Municipal Code is vague, and does not account for non-traditional families, or several unrelated people who rent a house together.

Englewood Municipal Code defines a household as including: "one (1) or more persons related by blood, marriage, adoption, or legal guardianship, including foster children, together in a dwelling unit; or two (2) unrelated persons and their children living together in a dwelling unit." E.M.C. § 16-11-2(B). The term "household" implies an intention that "household" would be interchangeable with "family." This Court must give deference to the definitions as codified by the City Council. The Code was changed in 2002, reducing the number of unrelated persons from eight to two, effectively eliminating roommates from the definition.

A statute or ordinance is unconstitutionally vague only if persons of common intelligence must guess at its meaning or would differ as to its application. *See Collins v. Jaquez,* 15 P.3d 299, 302 (Colo.App.2000). A reviewing court should interpret a statute, if possible, in a manner that will not render it unconstitutional. *Powell v. City of Colorado Springs,* 131 P.3d 1129, 1134 (Colo.App.2005)( *cert. granted* Apr. 10, 2006, 2006 WL 1628167); *see Sanger v. Dennis,* 148 P.3d 404, 411 (Colo.App.2006) (facial challenges must be rejected unless there exists no set of circumstances in which the statute can be constitutionally applied) *See also JJR 1, LLC v. Mt. Crested Butte,* 160 P.3d 365, 372 (Colo.App. 2007).

The American Heritage Dictionary defines "household" as follows: "a domestic unit consisting of the members of a family who live together along with nonrelatives . . . [or] a person or group of people occupying a single dwelling." American Heritage College Dictionary (4th Ed. 2007). The EMC definition fits within this description. It clearly defines a household as one or more persons living as a family or two unrelated persons and their children living in a single dwelling. This definition is not vague. As the Bartnicks have failed in their burden to establish that the ordinance is vague, the Court declines to reverse the Municipal Court's decision on this basis.

## IV: Prosecution of Zoning Violations Denied Bartnicks their Religious Freedoms.

Bartnicks assert that the guilty verdicts violate their freedom of religion and their freedom of assembly as guaranteed by the US and Colorado Constitutions.

The Free Exercise Clause of the First Amendment provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend I. The First Amendment is binding on the states through incorporation into the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Under the Free Exercise Clause, religious belief and the profession of that belief are absolutely protected, and religious practices also are protected to a lesser extent. *See Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)(superseded by statute). Neutral laws of general applicability that have an incidental effect on religious practices do not offend the Free Exercise Clause. An individual's religious beliefs do not excuse the individual from compliance with an otherwise valid law prohibiting conduct that the state is free to regulate. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532 (1993). "A rule that is discriminatorily motivated and applied is not a neutral rule of general applicability." *Axson-Flynn v. Johnson, supra,* 356 F.3d at 1294. A court should "apply a fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus, or whether the facts support an argument that the challenged rule is applied in a discriminatory fashion that disadvantages religious groups or organizations." *Grace*

*United Methodist Church v. City of Cheyenne, supra,* 451 F.3d at 651; *See Town of Foxfield,* 148 P.3d 339, 346.

Zoning ordinances are neutral laws of general applicability that have an incidental effect on religious practices. *Town of Foxfield v. Archdiocese of* Denver, 148 P.3d 339, (Colo. App. 2006). Their purpose is to ensure the health and safety of the population through housing and building standards. Here, after undertaking a fact-specific inquiry to determine whether the regulation at issue was motivated by a discriminatory animus, the Court finds that it was not. There is no evidence contained in the record supporting the proposition that the zoning ordinance was motivated in any way by religious animus. Nor is there any evidence in the record to support a finding that it was applied in a discriminatory fashion that disadvantaged any religious group or organization. The Court finds that the zoning ordinances in question regarding boarding houses and households does not offend the Free Exercise Clause.

## V: Bartnicks Faced Many Forms of Discrimination Which Caused Prejudice Against Them

### A. Prosecutor Discriminated Against Bartnicks

Bartnicks assert that they were discriminated against because the Prosecution failed to use the least aggressive means of reaching a solution. Bartnicks filed a Joint Motion for Binding Arbitration, requesting arbitration rather than criminal prosecution. ROA at VI. As stated above, the Court found no error in the Court's decision regarding this matter. *Id* at *W1.* Binding arbitration is a form of dispute resolution that is intended for civil litigants, not criminal defendants. The Bartnicks failed to provide any information indicating that there was any agreement concerning ADR which could have been enforced by the municipal court judge. Further, the availability of ADR is not a fundamental right guaranteed by the Constitution, and the failure to use ADR in a criminal prosecution is not a recognized form of discrimination.

Bartnicks also assert that the prosecutor's offer would require them to waive certain rights, and that the prosecutor failed to put the offer in writing. There was no acceptance of any plea in this matter. The record does not reflect any plea offers. The prosecutor was not compelled to make any offer to resolve this case. As a result, this allegation does not rise to the level of a recognized form of discrimination.

### B. Bartnicks were Repeatedly Denied Injunctions Against the City and its Actions.

Bartnicks assert that they applied for several injunctions from the City to protect them from prosecution, harassment, and other supposed slights from the community. The City did not have the authority to issue injunctions – injunction is a remedy of the courts, not the City. The Bartnicks did not file an action seeking to have the City enjoined from prosecution. Thus, this does not form a basis for reversal on appeal.

### C. Judge Failed to Adhere to the City Charter

Bartnicks assert that when the municipal judge "failed to establish the rules of the court," he violated Section 70 of the Home Rule Charter. Section 70 states: "The Municipal Judge shall establish rules of court and the Council shall, upon recommendations of the Judge, provide him with the necessary courtroom facilities, supplies, and clerical assistance." *Englewood Home Rule Charter, Part II.* The judge, during the Motions Hearing on February 12, 2009, did inform the Bartnicks that this was a criminal matter. *Municipal Court Record, MM 10.* The Court also informed the Bartnicks that they would be held to the same standards as attorneys. *Id* at 7. The Bartnicks were on notice that the Colorado Rules of Criminal Procedure would apply to a criminal case. Bartnicks were held to the same standards as attorneys, and this is not a form of discrimination.

### D. Bartnicks were Unable to Afford an Attorney and Judge Failed to Appoint One for Them

Bartnicks assert that because the judge denied their Motion for Court Appointed Counsel, that they were denied their right to counsel. Bartnicks applied for the Public Defender. On February 18, 2009, the municipal judge determined that the Bartnicks' monthly household income exceeded the guidelines provided by the Colorado Supreme Court. See ROA at QQ1. The Bartnicks were represented by counsel at the jury trial. They assert that they should not have to pay for that attorney's services. The Court finds no error in the trial court's decision that they were not entitled to representation based on income level.

### E. Bartnicks were Prevented from Presenting Their Entire Defense

Bartnicks assert that since they were not allowed to call any witnesses, they were prevented from presenting their entire defense. Bartnicks wanted to call Mr. Cohn to testify as to Zoning and Planning Commission policies and procedures. Specifically, Mr. Cohn would have testified as to what constitutes "substantial" changes made to recommendations by the City Council, which would require additional review by the Commission. Bartnicks' theory of defense was that the proper procedures were not followed when the City Council adopted Ordinance 55, therefore making it invalid. The municipal judge had previously ruled that the ordinance was valid. Thus, the municipal judge determined that Mr. Cohn's testimony was irrelevant, and therefore inadmissible.

Determinations of relevancy are a question of law, and therefore are determined by the court. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." C.R.E. 401. Mr. Cohn's testimony was offered to prove that the City Council failed to comply with the rules of creating new ordinances, which would cause Ordinance 55 itself to be invalid. The trial court determined that this testimony would not cause Bartnicks' innocence of the charges against them to be to more or less probable, and ruled that Mr. Cohn's testimony was irrelevant, and therefore inadmissible.

The Court reviews a trial court's rulings on evidentiary issues for an abuse of discretion. A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Stewart,* 55 P.3d 107, 122 (Colo.2002). Here, the record does not support that

the municipal court's decision regarding the testimony of Mr. Cohen was manifestly arbitrary, unreasonable or unfair.

## VI: New Zoning Ordinance Constitutes Ex Post Facto Law

The Bartnicks also assert that because they were running a permitted boarding house before Ordinance 55 came into effect, any criminal prosecution of their continued use after Ordinance 55 came into effect constitutes ex post facto prosecution, and is therefore unconstitutional.

Englewood is a home rule city and possesses every power possessed by the legislature as to all matters of local concern. Zoning is a matter of local concern. *City of Greeley v. Ells,* 186 Colo. 352, 527 P.2d 538 (1974).

A presumption of validity attaches to zoning decisions of municipal zoning authorities. Thus, a party challenging a zoning ordinance on constitutional grounds assumes the burden of proving the asserted invalidity beyond a reasonable doubt. *Sellon v. City of Manitou Springs,* 745 P.2d 229 (Colo.1987).

A nonconforming use is one which lawfully existed before the enactment of zoning ordinances and is maintained after the effective date of the ordinances, although it presently does not comply with the zoning restrictions applicable to the district in which it is situated. *Anderson v. Bd. of Adjustment for Zoning Appeals,* 931 P.2d 517 (Colo.App.1996).

Nonconforming uses are entitled to protection under the law. However, the right to extend, enlarge, or even continue a nonconforming use may legally be restricted. *Bird v. City of Colorado Springs,* 176 Colo. 32, 489 P.2d 324 (1971); *Anderson v. Bd. of Adjustment for Zoning Appeals, supra.* Nonconforming uses should be reduced to conformity as speedily as possible because they are necessarily inconsistent with the purposes of zoning and are not intended to be perpetual. *Art Neon Co. v. City & County of Denver,* 488 F.2d 118 (10th Cir.1973); *Wasinger v. Miller,* 154 Colo. 61, 388 P.2d 250 (1964); *Anderson v. Bd. of Adjustment for Zoning Appeals, supra.*

An owner of property is not immune from the exercise of the police power because he or she constructed a building that was in full compliance with the law when it was built. *Apple v. City & County of Denver,* 154 Colo. 166, 390 P.2d 91 (1964). "To hold that existing buildings are exempt from ordinances which impose standards designed to protect the safety and welfare of the public would in effect permit those whose actions are dangerous to the health and safety of the community to continue their deleterious conduct unchecked." *Apple v. City & County of Denver,* 154 Colo. at 172, 390 P.2d at 94; *City of Colorado Springs v. Miller,* 95 Colo. 337, 340, 36 P.2d 161, 162 (1934)(one who owns or acquires property "must be ever mindful of the right of the state or city to exercise its legislative authority for the common good").

Zoning ordinances should be interpreted strictly against allowing indefinite and perpetual continuation of a nonconforming use. *Anderson v. Bd. of Adjustment for Zoning Appeals, supra;*

*Wyatt v. Bd. of Adjustment-Zoning,* 622 P.2d 85 (Colo.App.1980). Provisions permitting nonconforming uses to continue should be construed strictly, and zoning provisions restricting nonconforming uses should be construed liberally. *Anderson v. Bd. of Adjustment for Zoning Appeals, supra.*

Colo. Const. art. II, § 11 provides, "No ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation ... shall be passed by the general assembly." A law is retrospective in operation when it " 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.' " *P-W Invs., Inc. v. City of Westminster,* 655 P.2d 1365, 1371 (Colo.1982)(quoting *Denver, S. Park & Pac. Ry. Co. v. Woodward,* 4 Colo. 162, 167 (1878)).

The purpose of the constitutional ban on retrospective legislation, like the ban on ex post facto laws, is to prevent the unfairness that results from changing the legal consequences of an act after the act has occurred. *Peoples Natural Gas Div. v. Pub. Utils. Comm'n,* 197 Colo. 152, 590 P.2d 960 (1979). The constitutional ban on retrospective operation does not prevent a city from enacting and enforcing ordinances to protect the health and safety of the community. *Van Sickle v. Boyes,* 797 P.2d 1267 (Colo.1990).

Changes in zoning ordinances which cause conforming uses to become nonconforming uses do not constitute ex post facto laws. Englewood had a duty to allow Bartnicks enough time to come into conformity, or to allow their nonconforming use to be grandfathered. The City Council created an exception to the new ordinance for the Bartnicks to achieve grandfathered status, but Bartnicks did not comply with the requirements of that exception. Therefore, they were required to comply with the new zoning ordinance, and to limit the number of non-related housemates to one.

Ordinance 55 was adopted on October 6, 2008. Bartnicks were served for violating the new ordinance on December 8, 2008. The Bartnicks had a period of sixty-four days to comply with the ordinance or comply with the requirements of the grandfathering exception. Sixty-four days provides sufficient time to come into complaince.

Ordinance 55, which amended §16-5-2(A)(7) of the Use Regulations, and the prosecution for noncompliance thereof, do not constitute an ex post facto law.

## VII: The Zoning Ordinance was a Bill of Attainder

Bartnicks assert that the adoption of Ordinance 55 constitutes a bill of attainder, and therefore is invalid.

A bill of attainder is a legislative enactment imposing criminal punishment without the benefit of a trial on a named individual or a readily identifiable group of individuals. U.S.C.A. Const. Art. 1, § 9. It is an act of the legislature declaring a person or group of persons guilty of some crime and punishing them without benefit of a trial. Ordinance 55 does not impose criminal punishment on defendant without a trial, either individually or as a member of a distinct

and identifiable class.  Ordinance 55 merely changes the zoning code.  It does not declare any person or group of persons guilty of anything, and for that reason alone it is not a bill of attainder.  *See Kourlis v. Port*, 18 P.3d 770 (Colo.App. 2000) (amendment to Pet Animal Care Facilities Act, after which defendant was in violation, did not constitute a bill of attainder because it did not impose criminal punishment on the defendant nonprofit animal shelter.) Additionally, Bartnicks were found guilty of violating the EMC after a two day jury trial.

### VII: Bartnick Household is not a Boarding House, but a Small Group Home

Bartnicks assert that their household should be defined as a small group home, which is permitted in their zone, and not a boarding house.

Englewood Municipal Code Section 16-11-1(D)(1) defines small group home:

a. *Characteristics.* Residential occupancy of a structure by a group of people that does not meet the definition of "Household Living," "Hotel," or "Detention Facility". Tenancy is arranged on a monthly or longer basis, and the size of the group may be larger than a household. Generally, group living structures have a common eating area for residents. The residents may receive care, training, or treatment, and caregivers may or may not reside at the site. Accessory uses commonly include recreational facilities and vehicle parking for occupants and staff.

b. (2) Group Living Facility, Small. A residence for up to eight (8) unrelated individuals, none of which are receiving on-site medical or psychological treatment, but some or all of whom may be receiving on-site physical assistance with day-to-day living activities. Examples of small group living facilities include any of the following that meet this definition:

(a) A nonprofit group home for the aged or an owner occupied group home for the aged, as defined in C.R.S. 31-23-303 (2)(B) et seq., as amended; or

(b) A state-licensed personal care boarding home, as defined in C.R.S. 25-27-101 et seq., as amended; or

(c) A state-licensed community residential home for persons with developmental disabilities, as defined in C.R.S. 27-10.5-101 et seq., as amended; or

(d) A home providing independent residential support services for the developmentally disabled, as defined in C.R.S. 27-10.5-102(19) et seq., as amended; or

(e) A state-licensed residential child care facility, as defined in C.R.S. 26-6-102(8) et seq., as amended; or

(f) A family care home, as defined in C.R.S. 26-6-102(4) et seq., as amended; or

(g) A foster care home, as defined in C.R.S. 26-6-102(4.5) et seq., as amended.

Ordinance 55 removed boarding houses from this list. The Englewood City Council, by removing boarding houses from this definition, clarified that group homes are intended to provide assistance to the disabled, the aged, children, or other people who cannot live on their own.

Bartnicks use their home to provide low cost housing to college students in the area. They are not providing any services beyond that which would explicitly or implicitly qualify their home as a small group home.

### IX: Bartnicks Failed to Receive Accommodations under ADA

Bartnicks assert that the trial court failed to make reasonable accommodations as required by the Americans with Disabilities Act (ADA).

The ADA states that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182. Bartnicks' attorney requires the use of a wheelchair. There is nothing in the record that indicates that any necessary accommodations were not made available, nor that there was any discrimination against the defense on the basis of the attorney's disability.

Additionally, Bartnicks fail to offer proof that they themselves are protected by the ADA, and that there is a disability from which either suffer.

### X: City Should Have Pursued Administrative Solutions, Rather Than Criminal

Bartnicks assert that because the zoning ordinances for which they were convicted are administrative in nature, the City should have pursued administrative solutions, rather than criminal prosecution.

The administrative courts are not a substitute for the criminal justice system. While the zoning ordinances are approved with the recommendation of the Zoning and Planning Commission, which is an administrative body, they are still enacted by the City Council, which is the legislature of Englewood. Violations of legislation, even zoning ordinances, are prosecuted in the criminal justice system.

### XI: Bartnicks Were Denied Essential Trial Rights.

Bartnicks assert that they were denied an evidentiary hearing to establish that documents were falsified. The municipal court is given the discretion to determine the manner of admission and admissibility of evidence. The Court reviews a trial court's rulings on evidentiary issues for an abuse of discretion. A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Stewart,* 55 P.3d 107, 122 (Colo.2002). The record does not reflect that the court's determination on this issue was in error.

## **CONCLUSION**

Bartnicks did suffer due process violations when their building permits were retroactively voided. Their convictions under Englewood Municipal Code Section 8-1-8(E) are OVERTURNED.

There was no abuse of discretion on behalf of the trial court. Bartnicks' convictions under Englewood Municipal Code Section 16-5-2(A)(7) are AFFIRMED.

Counsel of Record is to serve a copy of this Order on all *pro se* parties who have entered an appearance.

SO ORDERED.

Entered this 30th day of June, 2011.


Cc: Counsel of Record

BY THE COURT:

_____
Elizabeth A. Weishaupl
District Court Judge

Exhibit 2 at
Final Order



# INSURANCE POLICY COVERAGES & EXCLUSIONS: A GENERAL DESCRIPTION

**FOR INFORMATIONAL PURPOSES ONLY; NOT ALL PROVISIONS OF THIS OUTLINE APPLY TO YOUR POLICY**

COLORADO LAW REQUIRES INSURERS TO PROVIDE POLICYHOLDERS WITH A COPY OF THIS INFORMATION. THIS OUTLINE DOES NOT CHANGE YOUR INSURANCE POLICY.

*EXHIBIT 3*

Printed by State Farm Fire and Casualty Company

2/04 (C)

553-208 CO.7

*P¹*

## COLORADO HOMEOWNERS, RENTERS AND CONDOMINIUM OWNERS DISCLOSURE FORM

This disclosure form is a basic guide to the major coverages and exclusions in your policy. It is only a general description and not a contract or a policy of any kind. All coverages are subject to the terms, conditions, special limits, and exclusions of your policy and all applicable endorsements.

**PLEASE READ YOUR POLICY FOR DETAILS!** In the event of any conflict between the policy and this disclosure form, the provisions of the policy shall prevail.

This disclosure form also provides some guidelines on cancellation, nonrenewal, increase in premium and changes in coverage. These factors are general in nature and do not represent the only reasons a policy may be terminated or changed. Please contact your agent or company for further information.

### I.   BASIC COVERAGES — HOMEOWNERS

Homeowners policies include two basic sections. The first section provides protection for your home and your personal property. The second section provides protection for you when you're legally responsible (at fault) for an accident you have caused. It also includes medical payments coverage for persons, other than you or members of your household, who are injured in an accident that happens on your property. Homeowners policies do not cover automobiles.

### A.   HOMEOWNERS — PROPERTY

WHAT IS COVERED:

Your policy will pay for loss or damage to your house, your furniture, and other personal belongings when caused by the losses shown in the attached chart. Only limited coverage is provided for jewelry, silverware, furs, business property and other valuables.

Most policies have a deductible. The deductible is the amount of the loss that you, the policyholder, are responsible for paying. Your insurer will pay for the rest of the covered loss.

Your policy also will pay for additional living expenses if a covered loss renders your home uninhabitable and you must temporarily live elsewhere. This coverage pays, for a specified period, for reasonable and necessary extra living expenses you incur over what you would have normally spent to maintain your standard of living if no loss had occurred.

Exhibit 3

pg 2

## EXCLUSIONS — WHAT IS NOT COVERED

The policy does not provide coverage for all possible losses.  The following are examples of some of the loss that are **NOT** covered:

1. Loss or damage that an insured intentionally causes;

2. Flooding, earth movement, settling, cracking, bulging, shrinkage or expansion of the structure, other structures or of pavements, driveways or sidewalks;

3. Pollution and contamination;

4. Birds, vermin or house pets;

5. Wear and tear.

### B. HOMEOWNERS — PERSONAL LIABILITY

#### WHAT IS COVERED

Your policy pays for bodily injury and property damage to another's property for which you or a member of your household is legally responsible (at fault).  This includes the cost of defending you or a member of your household in a liability lawsuit.

#### EXCLUSIONS — WHAT IS NOT COVERED

The following are examples of some of the liability exclusions:

1. Any loss that an insured intends or should expect to happen;

2. Bodily injury to an insured person or property damage to an insured person's property;

3. Damage which results from the ownership or use of an automobile and other types of motorized land vehicles, aircraft or certain watercraft;

4. Liability resulting from the transmission or exposure of a communicable disease or sexual molestation.

## II. BASIC COVERAGES — RENTERS POLICY AND CONDOMINIUM OWNERS POLICIES

### A. Renters Policy

A renter's (or tenant's) policy provides coverage for your personal property and for your personal liability in the same way that a homeowners policy does.  The general coverages for the causes of loss shown in the attached chart are the same under a renters policy, however, the building you live in is not covered.  The amount of protection you choose will depend upon the value of the personal property you wish to insure.

Exhibit 3

pg 3

## B. Condominium Unit Owners Policy

A Condominium Unit Owners Policy is similar to a renter's policy in that it provides coverage for your personal property and personal liability. It differs, however, in that it also provides coverage for building items, including additions and alterations you make to your unit, that are your insurance responsibility under the governing rules of the condominium association. There also may be coverage for loss assessments levied on the unit owners by the condominium association.

## III. CANCELLATION, NONRENEWAL, INCREASE IN PREMIUM AND CHANGES IN COVERAGE

### A. Cancellation and Nonrenewal

You may cancel your policy at any time by notifying your company and indicating the date the cancellation is to take effect.

Your company may choose to cancel or nonrenew your policy. If your policy is canceled or nonrenewed, you will receive advance notice. Some examples of reasons for cancellation and nonrenewal include, but are not limited to:

1. Failure to pay your premium when it is due;

2. Knowingly making a false statement or a material misrepresentation on your application for your policy;

3. An unacceptable number of claims;

4. A substantial change in the use or occupancy of the premises.

### B. Increase in Premium

Conditions that may increase your premium include, but are not limited to:

1. Change of use of your home or premises;

2. A general rate increase. This results from the loss experience of a large group of policy-holders rather than from a loss suffered by an individual policyholder. A general rate increase applies to many persons in the group, not just those who had losses.

3. Adjustment for inflation. Some companies include inflation coverage in their policy. This coverage can automatically increase the amount of your insurance coverages as inflation pushes up the cost of replacing your home. The increases may be based on a construction cost index and may be reflected in the premium on each renewal date. No additional premium is charged for increases made during the term of the policy.

*(continued on back)*

Exhibit 3

p9 4

## C. Changes in Coverage

A number of situations may change the insurance coverage you have.  For example, you may choose to change the type of coverage you have, increase or reduce your limits or deductibles, or add optional coverages.

These factors are general in nature and do not represent the only reasons a policy may be changed.

**Please contact your agent or company with any questions about changes in coverage that you wish to make or about changes that your company has made.**

## IV.  LOWERING YOUR COSTS

Although the general classifications used by insurance companies to set rates may be beyond your control, it is possible to reduce the cost of your homeowners insurance without giving up necessary protection.  Here are some tips:

*Take the Highest or Broadest Deductible You Can Afford.*

Insurance should protect you from major losses.  Choosing a higher deductible may result in lower premiums.

*Check With Your Insurance Agent Before You Buy or Rent a New Home.*

Insurance rates are higher for some types of buildings.

*Ask If You Are Eligible For Discounts.*

Some companies may offer discounts  for characteristics which make your property subject to less chance of a loss. These may include discounts or credits for a new home, if you have had no recent losses, for being a non-smoker, if you are over a certain age, or if your home has smoke alarms, automatic fire sprinkler systems, and/or burglar alarms.

*Compare Coverages, Premiums, and Service When You Shop for Insurance.*

Exhibit 3

p9 5

| Kinds of Losses Covered | Type of Policy Selected* | | |
| --- | --- | --- | --- |
| | Homeowners | Renters | Condominium Unitowners |
| 1.  Fire or lightning | ▓ | █ | ▓ |
| 2.  Loss of property removed from premises endangered by fire or other perils | ▓ | █ | ▓ |
| 3.  Windstorm or hail | ▓ | █ | ▓ |
| 4.  Explosion | ▓ | █ | ▓ |
| 5.  Riot or civil commotion | ▓ | █ | ▓ |
| 6.  Aircraft | ▓ | █ | ▓ |
| 7.  Vehicles | ▓ | █ | ▓ |
| 8.  Smoke | ▓ | █ | ▓ |
| 9.  Vandalism and malicious mischief | ▓ | █ | ▓ |
| 10.  Theft | ▓ | █ | ▓ |
| 11.  Breakage of glass constituting a part of the building | ▓ | █ | ▓ |
| 12.  Falling objects | ▓ | █ | ▓ |
| 13.  Weight of ice, snow, sleet | ▓ | █ | ▓ |
| 14.  Collapse of building(s) or any part thereof | ▓ | █ | ▓ |
| 15.  Sudden and accidental tearing apart, cracking, burning, or bulging of a steam or hot water heating system or of appliances for heating water | ▓ | █ | ▓ |
| 16.  Accidental discharge, leakage or overflow of water or steam from within a plumbing, heating or air-conditioning system or domestic appliance | ▓ | █ | ▓ |
| 17.  Freezing of plumbing, heating and air-conditioning systems and domestic appliances | ▓ | █ | ▓ |
| 18.  Sudden and accidental damage from artificially generated currents to electrical appliances, devices, fixtures and wiring (TV and radio tubes not included) | ▓ | █ | ▓ |
| Accidental direct physical loss except flood, earthquake, war, nuclear accident and others specified in your policy.  Check your policy for a complete listing of perils not covered. | ▓ | | ▓ |

▓ **Dwelling**    █ **Contents**

\*   Types of policy go by various names with different insurance companies.  The kinds of losses covered and policy conditions may vary by company.

Exhibit 3

pg 6



STATE FARM INSURANCE COMPANIES

STATE FARM PAYMENT PLAN

1555 Promontory Circle
Greeley CO 80638-0001

1012-3140-20        312        2253-F627        06

BARTNICK, LAURA
2775 S DELAWARE ST
ENGLEWOOD CO  80110-1431

**CANCELLATION NOTICE**   NON-PAYMENT OF PREMIUM

| ACCOUNT NUMBER | 1012-3140-20 | Page 1 |
|---|---|---|
| Quarterly Account | | |

| NOTICE SENT | DUE BEFORE | AMOUNT DUE |
|---|---|---|
| AUG 28, 2006 | SEE BELOW | SEE BELOW |

THIS IS THE ONLY CANCELLATION NOTICE YOU WILL RECEIVE.

**Note:  A cancellation was also sent to the Payment Plan accountholder who is responsible for payment of this account.  This is your notice of cancellation.**

## POLICY CANCELLATION INFORMATION

State Farm Fire and Casualty Company

| NAME   POLICY NUMBER | DESCRIPTION | CANCEL DATE | BALANCE DUE |
|---|---|---|---|
| BARTNICK, LAURA & WILLIAM | | | |
| 06-KH-3666-4 | PERSONAL UMBRELLA | SEP 12, 2006 | $234.00 |

We have not received the payments required to keep this policy in force.  In accordance with the cancellation provisions, your policy identified in this notice is hereby canceled effective 12:01 A.M. standard time on the cancellation date specified due to non-payment of the premium.

We welcome the opportunity to provide your future insurance protection.  Should you wish to reinstate this policy, please forward your payment immediately.  Payment prior to the date and time of cancellation will reinstate your policy.  If paid after that date and time, you will be informed whether your policy has been reinstated and if so, the exact date and time of reinstatement.  There is no coverage between the date and time of cancellation and the date and time of reinstatement.

Exhibit   3a

POLICYHOLDER COPY

Agent        Rick Hayes Insur Agcy Inc
Telephone   303-761-1010

Account #    1012-3140-20
Prepared Date  AUG 25 2006



State Farm Insurance Companies
RECEIPT OF PAYMENT

PAYMENT DATE:        09-01-2006
TOTAL AMOUNT PAID:  $       350.04

WILLIAM JD BARTNICK                    RICK HAYES INS AGENCY INC
2775 S DELAWARE ST                     STATE FARM INSURANCE
ENGLEWOOD, CO  80110-1431              1220 E OLD HAMPDEN AVE
                                       ENGLEWOOD, CO
                                       80113
                                       (303) 761-1010

| POLICY DESCRIPTION / POLICY NUMBER | CHECK #/REF # | AMOUNT |
|---|---|---|
| SFPP – QUARTERLY<br>  1012-3140-20 | 6848 | $      350.04 |

Thank you for your payment on the above policy(ies).  Payments are
received subject to collection and policy provisions.  We appreciate
your business.

INITIALS: BEV

PLEASE CHECK OUT OUR STATE FARM BANK RATES FOR 90 DAY CD'S AND ASK
ABOUT STATE FARM REWARD DOLLARS!!

Exhibit 3a

the rights of cr ditors nor any liens upon the property of such companies shall be paired by such merger, but such liens shall be limited to the property upon which they were liens immediately prior to the time of such merger.

FOURTH: The Articles of Incorporation of the surviving company shall be amended to read as follows:

## ARTICLES OF INCORPORATION OF
## STATE FARM FIRE AND CASUALTY COMPANY

ARTICLE I.   The name of the corporation shall be STATE FARM FIRE AND CASUALTY COMPANY.

ARTICLE II.   The principal or home office of the corporation shall be located in the City of Bloomington, County of McLean, and State of Illinois.

ARTICLE III.   The period of duration of the corporation shall be perpetual.

ARTICLE IV.   The classes of insurance business in which the corporation proposes to engage and the kinds of insurance business in each class it proposes to write (including cession of and acceptance of reinsurance of all or any part of any risk) are as set forth and defined in

Class 2 (b) vehicle;   (c)   liability; and (j) contingent losses, and

Class 3 (a) fire;   (b) elements;   (c) war, riot and explosion; (d) marine and transportation;   (e) vehicle;   (f)   property damage, sprinkler leakage and crop;   (g) other fire and marine risks; and (h) contingent losses,

of Section 4 of the Illinois Insurance Code, or as clauses (b), (c) and (j) of Class 2 or any clause of Class 3 of said Section may be hereafter amended, said Code being An Act entitled: "An Act to revise the law relating to insurance and to repeal certain Acts therein named," (Approved June 29, 1937, Effective July 1, 1937) as amended.

ARTICLE V.   The capital stock shall be One Million Dollars ($1,000,000) divided into One Hundred Thousand (100,000) shares of Ten Dollars ($10) par value each.

ARTICLE VI.   (a)  The corporate powers shall be exercised by a Board of Directors the number of whom, within the minimum and maximum limits authorized by law, shall be as provided in the by-laws.

-2-

Exhibit 3b

printed from
Colorado Secretary of State
business website  *LfB*



# DIVISION OF BUILDING AND SAFETY
## 1000 ENGLEWOOD PARKWAY
## ENGLEWOOD, CO 80110

*EXHIBIT 58*

**BUILDING PERMIT**
PERMIT NO.
**BLD2007-00052**

| | | Date of Application | **02/27/2007** |
|---|---|---|---|

| | |
|---|---|
| Address of Job | **3029 S PEARL ST** |
| Owner Name | **BILL & LAURA BARTNICK** |
| Owner Address | **3029 S PEARL ENGLEWOOD, CO 80113** | Phone |
| Business/Tenant Name | |
| Contractor Name | **WELCH CONSTRUCTION, LLC** | City License No **14325** |
| Contractor Address | **6980 IRIS COURT ARVADA, CO 80004** | Phone **(303) 435-3316** |
| | | Class of Work **Addition** |
| Structure Classification | **One-Family Residential** |

| Description of work | **2 Story Addition** | | | | |
|---|---|---|---|---|---|
| Setbacks | North: **0** | South: **5** | East: **25** | West: **69** | SF of New Const **1,720** |
| Area at Grade: **589** | Height (Feet): **0** | No of Stories: **2** | Total Units: **0** | CO Reqd? **NO** | Occupancy Group **R3 - Residential** |
| Basement: **NO** | Garage: | | Dimensions: | Const Type: **Type V-N** | Use Zone: **R-1-C SFR Sm Lot** |

License No

**Required Reviews** — **Status**

| | |
|---|---|
| Admin Review (303)762-2366 | None Required |
| Electrical (303)762-2363 | Approved w/Cond |
| Eng. Resid. (303)762-2505 | Approved |
| Mechanical (303)762-2364 | Approved |
| Plumbing (303)762-2364 | Approved |
| Residential (303)762-2355 | Approved w/Cond |
| Utilities (303)762-2646 | Approved w/Cond |
| Zoning (303)762-2345 | Approved |

Architect/Engineers

**Remarks**
(3/27/2007 11:34 KMM) 2- story addition and pop top on existing one story. 5new bedrooms, 2 new baths, family room and laundry room.

First Floor - 589 Sq. Ft.
Second Floor - 1134 Sq. Ft.

NOTE: Valuation shown shall be based on the estimated total replacement cost to the owner (including labor, materials, equipment and installation). Valuation increases indicated through finance department audits may be subject to permit back-fees.

| Valuation of Work | **$104,000.00** |
|---|---|

### FEES

| | |
|---|---|
| ArapCountyOpnSpcTax .0625% of | $ 130.00 |
| Building Permit | $ 1,016.15 |
| Single Family Drainage Inspect | $ 24.00 |
| Use Tax (3.5% of 50% of Job) | $ 1,820.00 |

| | | |
|---|---|---|
| **tal Fees** | | **$ 2,990.15** |
| red | | Date |
| d | | **3/27/2007** |
| | it | |
| | nce | |

CITY OF ENGLEWOOD
Finance and Administrative Services

City of Englewood
1000 Englewood Parkway
Englewood, CO 80110
(303) 762-2300

3/29/2007   11:31 AM   0901   0004-5457
Cash Report: 070329-01 3/29/2007
01 - CL
01 - Central Cashier

Permit B Building
Permit Number BLD200700052
Perm t Address: 3029 S Pearl St
G/L: 02/1107/32207/0000
Validation Numb r: 118343      $1,016.15
Permit Building Use Tax
Permit Number BLD200700052
Permit Address: 3029 S Pearl St
G/L: 30.9999/31304/0000        $1,820.00
Validation Number: 118344
Arapahoe County Open Space Tax
G/L: 02/0000/20109/0000        $130.00
Validation Number: 118345
Storm Drainage Inspection Fees
Name: BLD2007 00052
Description: 3029 S Pearl St
G/L: 42/1607/32207/0000        $24.00
Validation Number: 118346
Total                          $2,990.15
Visa                          ($2,990.15)
****** *****2864
Auth Code: 094687

Thank you for your payment

*Exhibit 3c*

24 Hour Inspection Line (303) 762-2403



# DIVISION OF BUILDING AND SAFETY
## 1000 ENGLEWOOD PARKWAY
## ENGLEWOOD, CO 80110

**BUILDING PERMIT**

PERMIT NO.
**BLD2007-00356**

| Address of Job | **3029 S PEARL ST** | | | | Date of Application | 10/22/2007 |
|---|---|---|---|---|---|---|
| Owner Name | **BARTNICK, WILLIAM & LAURA** | | | | *EXHIBIT 92* | |
| Owner Address | **3029 S PEARL ST ENGLEWOOD, CO 80113-1641** | | | Phone | | |
| Business/Tenant Name | | | | | | |
| Contractor Name | **BARTNICK, WILLIAM & LAURA** | | | City License No | OL:2100016331 | |
| Contractor Address | **3029 S PEARL ST ENGLEWOOD, CO 80113-1641** | | | Phone | | |
| Structure Classification | **One-Family Residential** | | | Class of Work | **Addition** | |

| Description of work | **2 story addition** | | | | | |
|---|---|---|---|---|---|---|
| Setbacks | North: **0** | South: **0** | East: **0** | West: **0** | SF of New Const | **0** |
| Area at Grade: **0** | Height (Feet): **0** | No of Stories: **0** | Total Units: **0** | CO Reqd? | Occupancy Group | |
| Basement: | Garage: | Dimensions: | | Const Type: | Use Zone: | |

| Architect/Engineers | License No | | Required Reviews | Status |
|---|---|---|---|---|
| | | | Building (303)762-2369 | Approved |
| | | | Engineering (303)762-2504 | Approved |
| | | | Utilities (303)762-2646 | Approved |
| | | | Zoning (303)762-2345 | Approved |

Remarks
(10/22/2007 15:54 HLB)
    erence permit number BLD2007-00052

(1/10/2008 13:29 LS)
1/10/08 Permit voided. Owner contracted with unlicensed contractors to complete
project.

NOTE: Valuation shown shall be based on the estimated total replacement cost to the owner (including labor, materials, equipment and installation). Valuation increases indicated through finance department audits may be subject to permit back-fees.

| Valuation of Work | **$0.00** |
|---|---|

| **FEES** | |
|---|---|
| Building Permit | $ 23.50 |
| **Total Fees** | $ 23.50 |

| Approved By | Date |
|---|---|
| **HLB** | **10/22/2007** |

| Permit Issuance Date | 10/22/2007 |
|---|---|

**NOTES TO APPLICANT:**
- Seperate permits are required for Electrical, Plumbing, HVAC, and Demolition
- Permit becomes null and void if work is not commenced within 180 days or if work ceases or is abandoned or if no inspection is obtained for a period of 180 days.
- The City is not responsible to review the applicability of private covenants. Compliance with private plat covenants is the sole responsibility of the applicant/owner.
- For all work performed under this permit the applicant accepts full responsibility for compliance with the applicable Code and other applicable City Ordinances.
- For information call (303) 762-2356

Exhibit to our Jan 08, 2010 Motion to Stipulate 2nd to One set of Exhibits
Stipulated Index of Exhibits

*EXHIBIT 3c*

**PLAINTIFF'S EXHIBIT 5**

**State Farm®**
Providing Insurance and Financial Services
Home Office, Bloomington, Illinois 61710



July 26, 2007

Greeley Operations Center
P. O. Box 339409
Greeley, CO 80633-9409

LAURA AND WILLIAM JD BARTNICK
3029 S PEARL ST
ENGLEWOOD CO 80113-1641

RE:  Claim Number:  06-K181-510  ?
     Our Insured:    Bartnick, Linda and William JD
     Date of Loss:   May 15, 2007

Dear Ms. and Mr. Bartnick:

On Wednesday, July 25, 2007, I spoke with Claim Representative John Pacheco of our office. He informed me of your call and your request to issue the payment which I called to discuss with you on July 25.

Enclosed with this letter is a Statement of Loss along with the Additional Living Expense worksheet and a worksheet for meals/food/misc. This information is provided to help you understand the enclosed payments.

**COVERAGE A:**

You will find enclosed our payment of $20,459.46 for the repairs to your home from this water damage. This payment is based on the estimates ServPro, Restoration Services and McDonald Hardwood. The payment also reflexts the $1,000.00 advance previously issued to you. I have also included a copy of the estimates for your records. If there are additional repair costs which you believe would be covered under the claim, please provide those to us along with your explanation as to the additional cost and why these costs were incurred.

Your mortgage company is included on these payments as their interest in the home is protected under the homeowner's insurance policy.

**COVERAGE B:**

Also enclosed with this letter is our payment in the amount of $691.24 for the personal property damaged by the water. I have left the pews which you have listed at a cost of $1,500 open at this time, pending further information. Please contact a furniture refinisher and have them inspect the pews to determine if the water damage can be repaired. If there is a cost for this service, coverage and payment will be provided for this cost. If the furniture refinisher thinks the

*Corresponedence*  | *Exhibit   3e*

LAURA AND WILLIAM JD BARTNICK
06-K181-510
Page 2

pews cannot be refinished and repaired, please provide us with the information and source to confirm the replacement cost which you have listed. Once we have received and review that information, we will then discuss the settlement for those items.

## COVERAGE C:

Enclosed with this letter is our payment in the amount of $4,994.25 for the remaining Additional Living Expense incurred as listed on the Additional Living Expense worksheet.

In reviewing the restaurant meal receipts which you had furnished, there were three receipts which were significantly higher in cost, two of which we discussed on June 27. There was a third receipt at the restaurant, Pasquini's, which was dated July 9 in the amount of $54.36. The second meal receipt from the same restaurant dated July 23 was for $25.79. At this time based upon our prior conversation, I have reduced the July 9 receipt in half. If you wish for us to consider the full amount, please contact us in order to discuss this difference.

In our conversation of June 27, we agreed to an average per meal cost of $4.76 as a normal meal cost which you would incur. With this amount as the average incurred cost, I have abated the meal receipts by this amount for each meal.

As previously discussed, The receipts for expenses incurred while on vacation will not be covered under the policy.

The mileage allowance was based on our prior conversation and earlier payment to you as well. The additional mileage allowance was for the estimated additional mileage for Mr. Bartnick traveling from the hotel to his work and back on a weekly basis. This mileage allowance is through July 31 which would be 37 days at 18 miles a day. No mileage allowance was provided for Ms. Bartnick's travel as in our earlier conversations, her trips to the home was to oversee repairs to the house. With you acting as the general contractor and having agreed the payment to you for the building repairs would include Overhead and Profit, the cost of your mileage would be included in this allowance.

There were a number of receipts for groceries purchased at various stores and several receipts for coffees purchased at various coffee shops in the area. It was my understanding from our prior conversation the hotel room includes a small kitchen area and any groceries purchased would be seen as a normal expense. In addition, it was my understanding the hotel provided breakfast as part of the daily room rate. You have also requested payment for the boarding of your pets while in the hotel. I would like to discuss this you further as the hotel initially charged a pet deposit fee. In addition, I am continuing to review the phone receipts which you have provided to confirm the additional costs incurred.

The State Farm Homeowners Insurance Policy extends coverage for Additional Living Expense for the reasonable time in which to complete the covered repairs. During one of our initial conversations, we discussed concerns centering on the delay in selecting a contractor to complete the repair work. I believe it was during our conversation of June 27 in which we discussed your decision to act as your own general contractor on repairs. In speaking with Restoration Services, we were informed the repairs would take approximately four weeks from

3e

LAURA AND WILLIAM JD BARTNICK
06-K181-510
Page 3

the time they could have started.  Based on the information we have been provided, it would appear a reasonable repair time to complete the water damage repairs to be ending on July 31. However, as we have not discussed this with you to reach an agreement, I ask that you contact our office in order to reach an agreement and conclude this portion of your claim.

Thank you for your continued cooperation and assistance with this claim.  We look forward to hearing from you in the near future.

Sincerely,


Dennis E. Murphy, CPCU
Claim Representative
Team Extension 22321
800 811 2356
State Farm Fire and Casualty Company

24/416/22298

Enclosure

cc:     06-2253 RICK HAYES
        1220 E HAMPDEN AVE
        ENGLEWOOD CO 80113-2917

**State Farm®**
Providing Insurance and Financial Services
Home Office, Bloomington, Illinois 61710



October 1, 2007

LAURA BARTNICK
3029 S PEARL ST
INGLEWOOD CO 80113-1641

Greeley Operations Center
P. O. Box 339409
Greeley, CO 80633-9409

RE:   Claim Number:   06-K181-510
      Date of Loss:   May 15, 2007

Dear Mrs. Bartnick:

This letter is to follow up on the letter you submitted with a list of items you feel you have not been paid for by State Farm®.

Based on my review of the file, the POD bills and overage on your cell phone bill have been paid for. You indicate in the letter that you had a conversation with D. J. Holland of State Farm regarding hours you had worked relating to this claim. I contacted D. J. Holland and confirmed this conversation. She indicated that she had documented that you had 38 hours of labor. I have calculated the labor rate at our estimatics rate for cleaning at $23.00 an hour for the 38 hours.

Your letter also references mileage to and from the hotel for two months. I have enclosed a copy of the letter which was submitted to you from Dennis Murphy. Mr. Murphy advised in his letter that we would pay for Mr. Bartnick's travel time only and he has paid that allowance through July 31. Therefore, we still owe for the 18 days in August at 18 miles, which I calculated at $0.48.5 per mile. You have evidently also submitted some receipts to State Farm for dog-sitting. Please review Mr. Murphy's letter of July 31 regarding this issue. We will need to obtain additional information for consideration of the pet boarding receipts because a deposit fee was paid to the hotel for having pets.

In regard to the hotel bill and my recent payment of $706.16, this figure was calculated by using the total motel bill you submitted recently and subtracting what was shown in the file for a total payment on the hotel bill. After reviewing the file and speaking with the prior claim representative, the worksheet amount on the hotel bill was overstated. Mr. Murphy had paid you through July 24 and advised in the letter that July 31 was a reasonable time for the repairs to be done. In our telephone conversation I agreed to extend this time which was ultimately extended through August 19, 2007. The additional motel expense was for the period of July 25 until August 19 for a total additional payment of $2,475.00. You recently received a payment of $706.16 which would leave a balance owed to you of $1,768.84.

*[handwritten: Prove the POD + cell phone]*

*[handwritten: my mileage]*

*[handwritten: — This was for the Dog — first 2 wks out of the house]*

*[handwritten: EXHIBIT(S) 3 e]*

LAURA BARTNICK
06-K181-510
Page 2


We apologize for the miscalculation in the settlement of your claim.  Once again, if you are still
of the opinion that State Farm has not paid you the full amount for the POD rental and your cell
phone usage, please submit additional documentation to us for review.


Sincerely,



Jeff Lovelace
Claim Representative
307 672 9057
State Farm Fire and Casualty Company

12/026/1001016

Enclosure

3e

# State Farm Insurance Companies®



October 12, 2007

South Denver Operations Center
977 Pyramid Ct. Suite 300
Englewood, Colorado 80112-6009
Phone: (303) 264-1304

Trina Markey
CPCU, CLU, ChFC, AIC, LUTCF
Claim Section Manager

BILL & LAURA BARTNICK
3029 SOUTH PEARL STREET
ENGLEWOOD, CO 80113

Re:   Date/Receipt of DOI Letter:   October 4, 2007
      Division File Number:         210488/SLB
      Division File Name:           Bill Bartnick
      Our Insured:                  Bill & Laura Bartnick
      Policy Number:               06-KS-5597-6
      Claim Number:                06-K181-510
      Company:                     State Farm Fire and Casualty
      Date of Loss:                May 15, 2007
      NAIC:                        25143

Dear Mr. and Mrs. Bartnick:

The Colorado Division of Insurance has requested that we respond directly to you regarding your September 25, 2007 letter to the Division. I understand Mr. Bartnick spoke with Team Manager Kelly Maxwell on October 4, 2007, and also spoke to Mrs. Bartnick on October 5, 2007.

On October 5, 2007 Mrs. Bartnick explained her concerns as outlined in her letter. Mr. Maxwell apologized for any misunderstandings there may have been in the adjustment of your claim. Due to several issues involved, Mr. Maxwell suggested, and offered, to have a claim representative meet with you and go through receipts and invoices in order to provide an understanding and explanation of what has been paid and why. You declined the offer and did not wish to meet with anyone, but asked for an accounting of what has been paid on your claim.

Your loss occurred on May 15, 2007 as a result of a rainstorm. The roof of your home had previously been removed for remodeling. The rain caused damage throughout the home to the extent of $21,459.46 (Coverage A). Some personal property items also sustained damage. Total payment for those items amounted to $691.24, and an additional $874 was recently paid to you for your personal labor (Coverage B). Covered Additional Living Expense payments (Coverage C) currently total $10,794.27.

The enclosed Statements of Loss and Additional Living Expense Worksheets itemize claim expenses and payments to date. We have also enclosed previous letters which explain the basis for payment or non-payment of portions of your claim, including those we have discussed with you either by phone and/or in writing.

*Vague*

3e

Our latest letter to you written by Claim Representative Jeff Lovelace dated October 1, 2007, was in reply to your letter to the Colorado Department of Insurance since you were so kind as to provide Mr. Lovelace a copy.  Mr. Lovelace spoke with you at length and it is our understanding there are currently no covered outstanding bills or expenses unpaid.

The following will however address each of the six items outlined in your letter to the Department of Insurance.  A chronology of our handling of your claim will follow, and finally, applicable policy contract language is provided for your consideration.

1) The POD storage bills for two months: According to our records based on submitted receipts, all POD rental expenses have been paid in the amount of $924.82.  If this amount is incorrect we will need your help in documenting all POD rental expenses.

2) Your hours of work where you have requested payment at $25 per hour for a total of $500 has been paid.  However, Mr. Lovelace paid you for 38 hours at a rate of $23 per hour for a total of $874.00.  This was  outlined in his October 1, 2007 letter to you.

*T-Mobile bills*

3) Cell phone overage for two months: We are unable to determine any overage on receipts submitted from either Sprint or McLeod USA.  The documentation submitted for months prior to the loss are the same or less than your May bill, and the Sprint bill has a previous balance of $10.72.  The slight difference in the bill is what appears to be for long distance service.  If this is incorrect, we will need your assistance in helping us better understand the documentation submitted.

4) Mileage to and from the hotel for two months, 2 cars:  Mileage was paid as explained in our letter to you dated July 26, 2007.  It was paid for Mr. Bartnick's travel from the hotel to his work and back on a weekly basis.  No mileage was paid from Mrs. Bartnick's travel.  As stated in our earlier conversations, her trips to the home was to oversee repairs while acting as the general contractor.  In doing so, and having agreed the payment to you for the building repairs did include Overhead and Profit, the cost of Mrs. Bartnick's mileage would be considered part of the overhead any general contractor would incur to manage the repairs to the home.   *wrong*

Mr. Lovelace, in his letter to you dated October 1, 2007 did allow for an additional 18 days of travel by Mr. Bartnick for the month of August, paid at a rate of .485 per mile.

5) Receipt for dog sitting: Please see our letter to you dated July 26, 2007 by Claim Representative Dennis Murphy wherein he notes the hotel where you were staying charged a $150 pet deposit fee so your pets could remain with you. Therefore boarding of the pets would not be necessary.  If you have information that would show the hotel returned the pet deposit and boarding became necessary, please send it for our review and consideration.

*3e*

6) Hotel bill second to last week:  Mr. Lovelace's letter of October 1, 2007 and the payment included for the hotel expense from July 25 through August 19, 2007 ($2,475.00).  This additional expense was incurred after Mr. Lovelace agreed to extend Additional Living Expenses from the previously agreed date of July 31 to August 19, 2007.

A chronology of the handling of your claim is outlined below per the request of the Division.:

5/15/07: Date of Loss (insured's letter of September 25, 2007 lists the date of loss of May 14, 2007)

5/15/07: Loss Reported: Date of 1st contact: 5/15/07 (6:00 AM) and (4:30 PM). Afternoon conversation included discussion about contractor. At this time, Mrs. Bartnick indicated she wanted to use the general contractor who was involved with the home remodeling. Insured was provided with a $1,000 advance from agent.

5/21/07: Date of Inspection, at insured's request . During the inspection, the Premier Service Program (PSP) was discussed with the insured. Insured informed the field claim representative she was considering PSP as a contractor in the PSP program had inspected the damage and met with Mrs. Bartnick

5/29/07: Drying of structure: Completed by Serv-Pro

6/5/07: Policyholder returned from vacation: Mrs. Bartnick informs field claim rep. she will proceed through PSP for the general contractor and flooring company.

6/6/07: Mrs. Bartnick informed of decision to cover personal property.

6/7/07: Mrs. Bartnick was informed the policy does not extend coverage to dry out the dirt under the home. Insured told field claim representative she has called McDonald Hardwood for flooring estimate as she has not heard from PSP flooring contractor and she is undecided on having repairs completed through PSP.

6/13/07: Mrs. Bartnick called on status of ALE payment. Has not decided to proceed through PSP or not.

6/15/07: A message was left for the insured to call us to discuss items.

6/18/07:  Field claim representative spoke w/ Mrs. Bartnick: No decision made yet on contractor. She plans on using electrician from the general contractor doing the remodeling. PSP contractor had not heard from the insured to confirm if they were to do the repairs. Claim representative Dennis Murphy spoke with insured concerning A.L.E. and selection of contractor. Mrs. Bartnick advised she will use PSP contractor for repairs but act as their own general contractor.

6/27/07: Discussion with the insured on A.L.E. expenses and partial payment made to them. R.S.I. has not had a response from insured to their calls.

6/28/07: R.S.I. had not heard from the policyholder as of this time. They could have started repairs this week if they had been notified last week. Expect 3-4 weeks for repairs to be completed.

7/6/07: Called insured and left message for insured to call us.

7/23/07: Phone call from agent. Insured had called agent's office regarding her concerns on payment for A.L.E. expenses.

7/25/07: Claim Representative Dennis Murphy reviewed insured's receipts and left a message for the insured to call. Letter dictated to insured. *What is ALE*

7/26/07: Sent letter to insured along with payment for building repair cost, personal property loss and A.L.E. expenses

7/30/07: Message from the agent. The insured faxed a letter to him. The agent will fax the policyholder's letter to claims.

7/31/07: Letter from the insured reviewed and claim discussed with Team Manager Kevin Hanson.

8/3/07: Field Claim Representative Jeff Lovelace spoke w/ the insured on repairs, and authorized additional time in motel.

8/10/07: Field Claim Representative Jeff Lovelace receives information from Mrs. Bartnick that the hardwood floors will be installed next week and requests A.L.E. until 8/20/07.

8/13/07: FCR J. Lovelace learns Top *Knot* Not Hardwood no longer doing flooring work. Claim Representative has conversation with Mrs. Bartnick concerning the flooring and A.L.E. expenses.

8/15/07: Payment to insured for A.L.E. expenses.

9/17/07: Conversation with Mrs. Bartnick and Field Claim Representative Jeff Lovelace on A.L.E. items and additional payment sent to insured.

10/2/07:   Supplemental payment sent to insured after review of claim by Claim Representative.

10/4/07:   DOI complaint received and Team Manager Kelly Maxwell spoke with Mr. Bartnick who requested he call and speak with Mrs. Bartnick on 10/05/07 at 8:00 AM.

Per your letter to the Colorado Division of Insurance, applicable policy language follows. If you would like a full copy of your policy, please contact your State Farm Agent Rick Hayes.

**SECTION I - LOSSES INSURED**

**COVERAGE A - DWELLING**

3e

We insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION I- LOSSES NOT INSURED**.

**COVERAGE B - PERSONAL PROPERTY**

We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided:

**COVERAGE C – LOSS OF USE**

1. **Additional Living Expense**. When a Loss Insured causes the **residence premises** to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months. Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24 months. This coverage is not reduced by the expiration of this policy.

To date we have paid:

**Coverage A** for repairs to the home:  $21,459.46

**Coverage B** for clean-up, and repair of personal property:  $1,565.24

**Coverage C** for Additional Living Expenses:  $10,794.27

Thank you for the opportunity to review our handling of your claim.  If you have any additional information for us to consider or any other questions, Mr. Maxwell is available to assist you and he can be reached at 307-382-4371.

Sincerely,

*Trina Markey*

Trina Markey, CPCU, CLU, ChFC, AIC, LUTCF
Claim Section Manager
State Farm Insurance Companies

Enclosures:

1. 06/27/07 Letter to Laura Bartnick from CR Dennis Murphy
2. 06/27/07 Additional Living Expense Worksheet
3. 07/26/07 Letter to Laura and William Bartnick (3 pgs)
4. 07/25/07 Statement of Loss
5. 07/25/07 Additional Living Expense Worksheet
6. 08/15/07 Letter to Laura and William Bartnick from CR Jeff Lovelace
7. 08/14/07 Additional Living Expense Worksheet
8. 09/07/07 Letter to Laura and William Bartnick from CR Jeff Lovelace
9. 10/01/07 Letter to Laura Bartnick from CR Jeff Lovelace

cc w/encls:   Shawna L. Bailey, Senior Insurance Analyst
                 Colorado Division of Insurance
                 1560 Broadway, Suite 850
                 Denver, CO 80202

cc:            Rick Hayes, Agent 06-2253
                 Kelly Maxwell, Team Manager

3e

**COPY**

State Farm Insurance Company
P O Box 339409
Greeley, Co 80633-9409
1-800-811-2356

June 27, 2007

Laura Bartnick
William J Bartnick
3029 S Pearl St
Englewood, CO 80113-1641

RE:   Claim Number:  06-K181-510
      Date of Loss:  May 15, 2007

Dear Mr. and Mrs. Bartnick:

Enclosed is payment in the amount of $1,948.38.  This payment is
based on the enclosed Additional Living Expense Worksheet.  The
amount of this payment reflects the initial $1,000.  advance
provided by your agent. As we discussed, there are additional
costs which may qualify for coverage as an Additional Living
Expense.  If you would like us to consider any additional items
or increased charges, please contact us prior to incurring those
charges.


Thank you for the opportunity to assist you with your claim.
Please call if you have any questions, or if we can be of further
assistance.

Sincerely,

Dennis Murphy
Claim Representative
(800) 811-2356, ext. 22321

State Farm Fire and Casualty Company


cc:  Rick Hayes: 06-2253




                1) 06/27/07 Letter to
               Laura Bartnick from CR
                   Dennis Murphy


         HOME OFFICES:   BLOOMINGTON, ILLINOIS 61710

## ADDITIONAL LIVING EXPENSE WORKSHEET

| TYPE OF EXPENSE | AMOUNT PAID | AMOUNT NORMALLY SPENT | ADDED AMOUNT | ABATEMENT |
|---|---|---|---|---|
| **HOUSING** | | | | |
|   Motel | 1777.14 | $   - | $   1,777.14 | |
|   Rent | | | | |
| **UTILITIES** | | | | |
|   Heating | | | | |
|   Gas | | | | |
|   Water | | | | |
|   Telephone | | | | |
|   Electricity | $   73.10 | $   40.29 | $   32.81 | |
|   Other | | | | |
| **FOOD** | | | | |
|   Meals in Restaurants | $   282.92 | $   42.84 | $   240.08 | |
|   Food Prepared at Home | | | | |
| **TRANSPORTATION** | | | | |
|   Automobile (Personal) | $   630.50 | | $   630.50 | |
|   Taxicabs and Buses, etc. | | | | |
|   GAS | | | | |
| **MISCELLANEOUS** | | | | |
|   Laundry | | | | |
|   Dry Cleaning | | | | |
|   Garbage Disposal | | | | |
|   Storage | | | | |
|   Other: Pod sto | $   267.85 | $   - | $   267.85 | |
|   Other | | | | |
| **TOTAL** | ▨▨▨ | ▨▨▨ | $   2,948.38 | |

INSURED:      Laura and William Bartnick

CLAIM NUMBER:  06-K181-510           Additional Living Expense

CLAIM REP:    Dennis Murr            (Col 3 less Col 4)      $2,948.38

DATE:        6/27/2007

**2)  06/27/07 Additional Living
Expense Worksheet**



**State Farm®**
Providing Insurance and Financial Services
Home Office, Bloomington, Illinois 61710



July 26, 2007

Greeley Operations Center
P. O. Box 339409
Greeley, CO 80633-9409

LAURA AND WILLIAM JD BARTNICK
3029 S PEARL ST
ENGLEWOOD CO 80113-1641

‖I‖II‖II‖II‖II‖II‖II‖II‖II‖I‖II

RE:    Claim Number:    06-K181-510
       Our Insured:     Bartnick, Linda and William JD
       Date of Loss:    May 15, 2007

Dear Ms. and Mr. Bartnick:

On Wednesday, July 25, 2007, I spoke with Claim Representative John Pacheco of our office. He informed me of your call and your request to issue the payment which I called to discuss with you on July 25.

Enclosed with this letter is a Statement of Loss along with the Additional Living Expense worksheet and a worksheet for meals/food/misc. This information is provided to help you understand the enclosed payments.

**COVERAGE A:**

You will find enclosed our payment of $20,459.46 for the repairs to your home from this water damage. This payment is based on the estimates ServPro, Restoration Services and McDonald Hardwood. The payment also reflexts the $1,000.00 advance previously issued to you. I have also included a copy of the estimates for your records. If there are additional repair costs which you believe would be covered under the claim, please provide those to us along with your explanation as to the additional cost and why these costs were incurred.

Your mortgage company is included on these payments as their interest in the home is protected under the homeowner's insurance policy.

**COVERAGE B:**

Also enclosed with this letter is our payment in the amount of $691.24 for the personal property damaged by the water. I have left the pews which you have listed at a cost of $1,500 open at this time, pending further information. Please contact a furniture refinisher and have them inspect the pews to determine if the water damage can be repaired. If there is a cost for this service, coverage and payment will be provided for this cost. If the furniture refinisher thinks the

3)  07/26/07 Letter to Laura and
    William Bartnick (3 pgs)

*Se*

LAURA AND WILLIAM JD BARTNICK
06-K181-510
Page 2

pews cannot be refinished and repaired, please provide us with the information and source to confirm the replacement cost which you have listed. Once we have received and review that information, we will then discuss the settlement for those items.

**COVERAGE C:**

Enclosed with this letter is our payment in the amount of $4,994.25 for the remaining Additional Living Expense incurred as listed on the Additional Living Expense worksheet.

In reviewing the restaurant meal receipts which you had furnished, there were three receipts which were significantly higher in cost, two of which we discussed on June 27. There was a third receipt at the restaurant, Pasquini's, which was dated July 9 in the amount of $54.36. The second meal receipt from the same restaurant dated July 23 was for $25.79. At this time based upon our prior conversation, I have reduced the July 9 receipt in half. If you wish for us to consider the full amount, please contact us in order to discuss this difference.

In our conversation of June 27, we agreed to an average per meal cost of $4.76 as a normal meal cost which you would incur. With this amount as the average incurred cost, I have abated the meal receipts by this amount for each meal.

As previously discussed, The receipts for expenses incurred while on vacation will not be covered under the policy.

The mileage allowance was based on our prior conversation and earlier payment to you as well. The additional mileage allowance was for the estimated additional mileage for Mr. Bartnick traveling from the hotel to his work and back on a weekly basis. This mileage allowance is through July 31 which would be 37 days at 18 miles a day. No mileage allowance was provided for Ms. Bartnick's travel as in our earlier conversations, her trips to the home was to oversee repairs to the house. With you acting as the general contractor and having agreed the payment to you for the building repairs would include Overhead and Profit, the cost of your mileage would be included in this allowance.

There were a number of receipts for groceries purchased at various stores and several receipts for coffees purchased at various coffee shops in the area. It was my understanding from our prior conversation the hotel room includes a small kitchen area and any groceries purchased would be seen as a normal expense. In addition, it was my understanding the hotel provided breakfast as part of the daily room rate. You have also requested payment for the boarding of your pets while in the hotel. I would like to discuss this you further as the hotel initially charged a pet deposit fee. In addition, I am continuing to review the phone receipts which you have provided to confirm the additional costs incurred.

The State Farm Homeowners Insurance Policy extends coverage for Additional Living Expense for the reasonable time in which to complete the covered repairs. During one of our initial conversations, we discussed concerns centering on the delay in selecting a contractor to complete the repair work. I believe it was during our conversation of June 27 in which we discussed your decision to act as your own general contractor on repairs. In speaking with Restoration Services, we were informed the repairs would take approximately four weeks from

3e

LAURA AND WILLIAM JD BARTNICK
06-K181-510
Page 3

the time they could have started.  Based on the information we have been provided, it would appear a reasonable repair time to complete the water damage repairs to be ending on July 31. However, as we have not discussed this with you to reach an agreement, I ask that you contact our office in order to reach an agreement and conclude this portion of your claim.

Thank you for your continued cooperation and assistance with this claim.  We look forward to hearing from you in the near future.

Sincerely,


Dennis E. Murphy, CPCU
Claim Representative
Team Extension 22321
800 811 2356
State Farm Fire and Casualty Company

24/416/22298

Enclosure

cc:    06-2253 RICK HAYES
       1220 E HAMPDEN AVE
       ENGLEWOOD CO 80113-2917

## STATE FARM INSURANCE

# STATEMENT OF LOSS

Insured _____ **Laura and William Bartnick** _____   Claim Number _____ **06-K181-510** _____

## COVERAGE A - BUILDING

Limit of Liability $ _____ **240,000.00** _____

| Description | Amount $ |
|---|---|
| Serv-Pro emergency service/dry out of home | 3,975.14 |
| Repairs as agreed per the estimate from R.S.I. | 9,154.04 |
| wood floor repair per est. from McDonald Hardwood | 8,330.28 |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total A** | $ **21,459.46** |

## COVERAGE B - CONTENTS

Limit of Liability $ _____ **180,000.00** _____

| Description | Amount $ |
|---|---|
| per Contents Inventory | 691.24 |
| NOTE: as of 7/25: pews are open items | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total B** | $ **691.24** |

## COVERAGE C - LOSS OF USE

Limit of Liability $ _____

| Description | Amount $ |
|---|---|
| per A.L.. E. worksheet dated 7/25/07 | 8,132.73 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total C** | $ **8,132.73** |

**Comments/Supplements:**

| | | | |
|---|---|---|---|
| Total Payable | $29,083.43 | Total A + B + C | $30,283.43 |
| | | Plus Special Coverage | $0.00 |
| **Less Prior Payments:** | | Total Loss | $30,283.43 |
| Coverage A | $1,000.00 | Less Depreciation - Cov. A | $0.00 |
| Coverage B | $0.00 | Less Depreciation - Cov. B | $0.00 |
| Coverage C | $1,938.48 | Subtotal | $30,283.43 |
| Current Payment | $26,144.95 | Less Deductible | $1,200.00 |
| | | Total Payable | $29,083.43 |

_____ Dennis Murphy Team 1 800-811-2356, ext 22321 _____   _____ July 25, 2007 _____
SIGNATURE   DATE

660-233.2 Rev. 6-95 Printed in U.S.A.

**4)  07/25/07 Statement Of Loss**

## ADDITIONAL LIVING EXPENSE WORKSHEET

| TYPE OF EXPENSE | AMOUNT PAID | AMOUNT NORMALLY SPENT | ADDED AMOUNT | ABATEMENT |
|---|---|---|---|---|
| **HOUSING** | | | | |
| Motel: through 7/24 | 6390.19 | $          - | $      6,390.19 | |
| Rent | | | | |
| **UTILITIES** | | | | |
| Heating | | | | |
| Gas | | | | |
| Water | | | | |
| Telephone | | | | |
| Electricity | $        73.10 | $        40.29 | $          32.81 | |
| Other | | | | |
| **FOOD** | | | | |
| Meals in Restaurants | $       626.41 | 29 @4.76=$138.( | $         488.37 | |
| Food Prepared at Home | | | | |
| **TRANSPORTATION** | | | | |
| Automobile (Personal) | $       953.51 | $          - | $         953.51 | |
| Taxicabs and Buses, etc. | | | | |
| GAS | | | | |
| **MISCELLANEOUS** | | | | |
| Laundry | | | | |
| Dry Cleaning | | | | |
| Garbage Disposal | | | | |
| Storage | | | | |
| Other:  Pod stoi | $       267.85 | $          - | $         267.85 | |
| Other | | | | |
| **TOTAL** | | | $      8,132.73 | |

INSURED:          Laura and William Bartnick

CLAIM NUMBER:   06-K181-510                              Additional Living Expense

CLAIM REP:        Dennis Murphy                            (Col 3 less Col 4)          $8,132.73

DATE:              7/25/2007

**5)  07/25/07 Additional Living
Expense Worksheet**

**State Farm®**
Providing Insurance and Financial Services
Home Office, Bloomington, Illinois 61710



August 15, 2007

LAURA AND WILLIAM BARTNICK
3029 S PEARL ST
ENGLEWOOD CO 80113-1641

**Greeley Operations Center**
P. O. Box 339409
Greeley, CO 80633-9409

IllulIlluuillullullluullllluululuulllulllluululll

RE:   Claim Number:   06-K181-510
      Date of Loss:    May 15, 2007

Dear Laura and William Bartnick:

I have enclosed a draft for additional living expenses along with an updated worksheet.  The total payment of $8,490.26 includes the current payment plus a $1,000 advance, $4994.25 payment, and $1,948.38 payment which were previously made.  Please contact our office if you have any questions.

Sincerely,


Jeff Lovelace
Claim Representative
307 672 9057
State Farm Fire and Casualty Company

24/424/36504

Enclosure


**6)  08/15/07 Letter to Laura and**
**William Bartnick from CR Jeff**
**Lovelace**

08/14/07  TUE 10:56 FAX 3076722011          SHERIDAN          →→→ FIRE CIOS          ☒001

# ADDITIONAL LIVING EXPENSE WORKSHEET

*(To be completed by Claim Representative.)*

| TYPE OF EXPENSE | AMOUNT PAID | AMOUNT NORMALLY SPENT | ADDED AMOUNT | ABATEMENT |
|---|---|---|---|---|
| **HOUSING** | | | | |
| Motel or Hotel | 6390.19 | | $ 6,390.19 | |
| Rent | | | | |
| **UTILITIES** | $ 198.50 | 40.29*2months | $ 117.92 | |
| Heating | | | | |
| Gas | | | | |
| Water | | | | |
| Telephone | | | | |
| Electricity | | | | |
| Other | | | | |
| **FOOD** | | | | |
| Meals in Restaurants | $ 822.96 | 44 meals@ $4.7 | $ 613.52 | |
| Food Prepared at Home | | | | |
| **TRANSPORTATION** | | | | |
| Automobile (Personal) | $ 979.51 | | $ 979.51 | |
| Taxicabs and Buses, etc. | | | | |
| Other | | | | |
| **MISCELLANEOUS** | | | | |
| Laundry | | | | |
| Dry Cleaning | | | | |
| Garbage Disposal | | | | |
| Storage | | | | |
| POD rental | $ 389.12 | | $ 389.12 | |
| Other | | | | |
| **TOTAL** | ▨▨▨▨▨ | ▨▨▨▨▨ | $ 8,490.26 | |

INSURED:          Laura & William Bartnick

CLAIM NUMBER:  06-k181-510                    Additional Living Expense

CLAIM REP:        Jeff Lovelace                    (Col 3 less Col 4)          $8,490.26

DATE:              8/14/2007





**State Farm®**
Providing Insurance and Financial Services
Home Office, Bloomington, Illinois 61710

September 7, 2007

LAURA AND WILLIAM BARTNICK
3029 S PEARL ST
ENGLEWOOD CO 80113-1641

IIuIdIuuuIIuIIuIIuuIIuIIuuIuIuuIIuIuIIuIuuIuII

Greeley Operations Center
P. O. Box 339409
Greeley, CO 80633-9409

RE:     Claim Number:     06-K181-510
        Date of Loss:      May 15, 2007

Dear Ms. Bartnick:

This letter is to follow up on the above-referenced claim.

I have enclosed a draft for $1,378.03.  This payment includes $706.16 for the balance due on the motel rooms, $187.17 for the meal abatement based on the current receipts submitted, $288.38 for the balance due on the pod rental, $170 for the phone bill, and $226.32 for the grocery food abatement. $200 was subtracted from the total amount for the balance of your $1200 deductible because there has only been $1000 applied so far.

Please call if you have any questions. Thank you for your cooperation in this matter.

Sincerely,

Jeff Lovelace
Claim Representative
307 672 9057
State Farm Fire and Casualty Company

24/413/55132

Enclosure

8)  09/07/07 Letter to Laura and
William Bartnick from CR Jeff
Lovelace

*3c*



**State Farm®**
Providing Insurance and Financial Services
Home Office, Bloomington, Illinois 61710

October 1, 2007

LAURA BARTNICK
3029 S PEARL ST
INGLEWOOD CO 80113-1641

Greeley Operations Center
P. O. Box 339409
Greeley, CO 80633-9409

||..|.|.|....||..||..||..||...|||.|..|..|..||..|.||.|..|..|.||

RE:   Claim Number:    06-K181-510
      Date of Loss:    May 15, 2007

Dear Mrs. Bartnick:

This letter is to follow up on the letter you submitted with a list of items you feel you have not been paid for by State Farm©.

Based on my review of the file, the POD bills and overage on your cell phone bill have been paid for. You indicate in the letter that you had a conversation with D. J. Holland of State Farm regarding hours you had worked relating to this claim. I contacted D. J. Holland and confirmed this conversation. She indicated that she had documented that you had 38 hours of labor. I have calculated the labor rate at our estimatics rate for cleaning at $23.00 an hour for the 38 hours.

Your letter also references mileage to and from the hotel for two months. I have enclosed a copy of the letter which was submitted to you from Dennis Murphy. Mr. Murphy advised in his letter that we would pay for Mr. Bartnick's travel time only and he has paid that allowance through July 31. Therefore, we still owe for the 18 days in August at 18 miles, which I calculated at $0.48.5 per mile. You have evidently also submitted some receipts to State Farm for dog-sitting. Please review Mr. Murphy's letter of July 31 regarding this issue. We will need to obtain additional information for consideration of the pet boarding receipts because a deposit fee was paid to the hotel for having pets.

In regard to the hotel bill and my recent payment of $706.16, this figure was calculated by using the total motel bill you submitted recently and subtracting what was shown in the file for a total payment on the hotel bill. After reviewing the file and speaking with the prior claim representative, the worksheet amount on the hotel bill was overstated. Mr. Murphy had paid you through July 24 and advised in the letter that July 31 was a reasonable time for the repairs to be done. In our telephone conversation I agreed to extend this time which was ultimately extended through August 19, 2007. The additional motel expense was for the period of July 25 until August 19 for a total additional payment of $2,475.00. You recently received a payment of $706.16 which would leave a balance owed to you of $1,768.84.

3e

9)  10/01/07 Letter to Laura Bartnick
from CR Jeff Lovelace